Roger Moffitt
AT&T Services, Inc.
645 E. Plumb Lane, Room B132
Reno, Nevada 89502
Telephone: (775) 333-3114
Bar No. 5723

Bettina Getz (*pro hac vice*)
Lauren R. Noll(*pro hac vice*)
Anne M. De Geest (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Attorneys for Plaintiff
THE SOUTHERN NEW ENGLAND
TELEPHONE COMPANY

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
## LAS VEGAS DIVISION

THE SOUTHERN NEW ENGLAND
TELEPHONE COMPANY,

    Plaintiff,

    v.

SAHARA AND ARDEN, INC., and GLOBAL
NAPS REALTY, INC.,
    Defendants.

Case 2:09-cv-00534-RCJ-PAL

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
(REDACTED)**

# TABLE OF CONTENTS

**Page**

I.   UNDISPUTED MATERIAL FACTS ................................................................. 2

   A.   SNET's Unsatisfied Judgment ................................................ 2

   B.   The Global NAPs Family of Companies ................................................ 4

      1.   Ferrous Miner and its "File Companies" ................................... 4

      2.   Realty ................................................................... 6

      3.   Sahara ................................................................... 6

      4.   Defendants' Recordkeeping ........................................... 7

   C.   Acquisition of the Las Vegas Property in 2000 ........................ 7

   D.   Conveyance of the Las Vegas Property in 2005 ........................ 8

II.  STANDARD OF REVIEW ..................................................................... 13

III. ARGUMENT ................................................................................. 14

   A.   The Conveyance of the Las Vegas Property Was Actually Fraudulent............. 15

      1.   SNET Has Established a Majority of the "Badges" of Fraud as a Matter of Law. ................................................................... 15

         a.   Realty transferred the property to an insider............................. 17

         b.   The Global NAPs entities retained possession and control of the property after the transfer. ........................................... 19

         c.   Before the transfer was made, Realty had been sued or threatened with suit. ................................................... 20

         d.   The defendants concealed assets............................. 21

         e.   There was no consideration. ................................. 22

         f.   Realty was insolvent or became insolvent shortly after the transfer was made. ................................................... 24

         g.   The transfer was of substantially all of Realty's assets. ............. 25

         h.   The transfer occurred shortly before or after Realty incurred a substantial debt. ........................................... 26

      2.   Defendants Failed To Meet Their Burden of Proof. ................. 27

   B.   The Conveyance of The Las Vegas Property Was Constructively Fraudulent. ................................................................... 28

IV.  CONCLUSION................................................................................ 30

1
2
3

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

4          Plaintiff The Southern New England Telephone Company ("SNET") respectfully moves

5   the Court pursuant to Fed. R. Civ. P. 56 to enter summary judgment in favor of SNET on its

6   complaint.

7          This case concerns a fraudulent conveyance of property.  In November 2005, defendant

8   Global NAPs Realty, Inc. ("Realty") conveyed land located in Las Vegas, Nevada, to co-

9   defendant Sahara and Arden, Inc. ("Sahara").  SNET is seeking to set aside the conveyance in

10  partial satisfaction of the $5.8 million default judgment that it obtained in 2008 after a

11  Connecticut district court found that the defendants there, including Realty and its alter egos, had

12  destroyed documents and committed a fraud on the court.

13          As set out more fully below, this is a textbook case of actual (or, in the alternative,

14  constructive) fraud.  Both Realty (the seller) and Sahara (the buyer) are owned and controlled by

15  the same individual: Frank Gangi.  Realty transferred the property in exchange not for money but

16  for an undocumented assumption of a debt previously held by Realty, notwithstanding the fact

17  that Sahara has no income and no revenue and no way ever to repay the debt that it assumed.

18  The transfer occurred when both Realty and its alter egos had been sued in several lawsuits and

19  at a time when judgments already had been entered against them.  The transfer also occurred at

20  the time when Realty was transferring its only other pieces of property to other similar shell

21  entities, and when Realty's assets (if any) were greatly outweighed by its liabilities.

22          Because defendants have not offered *a single* piece of evidence that rebuts the

23  overwhelming evidence in the record, as they are required to do in order to avoid summary

24  judgment, summary judgment is proper.

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     UNDISPUTED MATERIAL FACTS**

     **A.     SNET's Unsatisfied Judgment**

SNET first brought suit against the Global NAPs family of companies in December 2004 in federal district court in Connecticut.  *The Southern New England Telephone Co. v. Global NAPs, Inc.*, Case No. 3:04-CV-2075-JCH (D. Conn. Dec. 7, 2004) (Hall, J.) ("Connecticut Action").  SNET's complaint—initially brought solely against Global NAPs, Inc. ("Global Inc.")—alleged that Global Inc. owed millions of dollars in unpaid charges under SNET's federal tariff for telecommunications services.  *Id.*  In May 2006, the Connecticut court granted SNET a prejudgment remedy in the amount of $5.25 million, and ordered Global Inc. to either post a bond or disclose information concerning its assets in an amount sufficient to satisfy the prejudgment remedy.  Doc. No. 133 (May 5, 2006 Order) in Connecticut Action.  Global Inc. initially represented that certain of its telecommunications equipment would satisfy the prejudgment remedy, but then reversed course and informed the court that the equipment was essentially worthless.  Doc. No. 191 in Connecticut Action, Ex. A at 5-6.

After the Connecticut district court ordered Global Inc. to designate a 30(b)(6) witness to testify regarding its corporate assets, SNET deposed Frank Gangi's brother, Richard Gangi ("Richard"), Global Inc.'s treasurer (now deceased).  Richard testified, among other things, that Global Inc. did not have sufficient assets anywhere in the world to satisfy the $5.25 million prejudgment remedy; that Global Inc. had transferred all of its equipment (except the handful of equipment located in Connecticut that it characterized as worthless) to another Global entity called Global NAPS Networks, Inc. without compensation or documentation; and that Global Inc.'s customer contracts had been assigned after one year to Global NAPs Networks, again without compensation or documentation.  Ex. A (5/31/06 R. Gangi Dep.) at 57-60, 63, 121, 124-25.

In 2006, SNET amended its complaint with leave of court to name as defendants Realty, Global NAPs New Hampshire, Inc. Global NAPs Networks, Inc., and Ferrous Miner Holdings, Ltd. ("Ferrous Miner"). The amended complaint alleged that the new defendants were mere alter egos of Global Inc. and sought to pierce the corporate veils of the new defendants to hold them liable for the debts of Global Inc. Doc. No. 192 (June 30, 2006) in Connecticut Action.

On July 1, 2008, after sanctioning the defendants numerous times for discovery violations and entering partial summary judgment in SNET's favor, the court entered a default judgment against all of the Global NAPs defendants for more than $5.8 million, jointly and severally, on the basis of the defendants' continued and "willful violations" of the court's orders and the "fraud" that they had committed upon the court:

> The court finds that all defendants have willfully violated the court's discovery orders by failing to turn over their general ledgers and other business records, lying to the court about the inability to obtain documents from third parties, and destroying and withholding documents that were within the scope of the discovery requests and Orders. These defendants have committed a fraud upon this court. These willful violations have prejudiced, indeed likely destroyed, SNET's ability to prove its case, and have squandered judicial resources by dragging the court into frequent policing of discovery disputes over an inordinate period of time.

*SNET v. Global NAPs, Inc. et al.*, 251 F.R.D. 82, 96 (D. Conn. 2008). The court concluded, among other things, that the defendants had lied to delay the production of financial records, had no credible explanation for their failure to produce some records, "falsely argued to the court" that certain documents did not exist, had "willfully destroyed or hidden financial documents," "willfully destroyed evidence contained on the computer" used by their bookkeeper by running "file wiping programs," and had attempted to conceal their actions." *Id.* at 93. The court found that Richard had "intentionally lied to the court with the purpose of delaying the discovery of bookkeeping records," and that after Richard's death, his brother Frank—president and CEO of all the defendants—had "directed his agents and employees . . . to remove Richard Gangi's

computer from his house and to empty his home filing cabinet of documents, "us[ing] Gangi's death to further delay and frustrate compliance with the court's discovery orders." *Id.* at 94.

SNET duly registered its judgment in this Court. Certification of Judgment for Registration in Another District, *The Southern New England Telephone Co. v. Global NAPs, Inc., et al.*, Case No. 2:09-ms-00021-NA (D. Nev. Mar. 19, 2009). As part of its multi-pronged attempt to collect on its judgment, which still remains almost entirely unsatisfied, SNET brought the instant action in 2009 to set aside what it contends to be a fraudulent conveyance by Realty of real property located in Las Vegas at the intersection of Sahara and Arden Avenues ("Las Vegas Property") to Sahara.

### B.     The Global NAPs Family of Companies

1.     Ferrous Miner and its "File Companies"

Ferrous Miner is a holding company and sole shareholder of all the Global NAPs entities. Ex. B (Frank T. Gangi deposition dated Dec. 22, 2009 [hereinafter "F. Gangi Dep."]) at 26-27; Answer ¶ 8. Ferrous Miner was incorporated in 1997, with its principal offices at 10 Merrymount, Quincy, Massachusetts. Defendant Realty, along with the other Global NAPs entities, are wholly owned subsidiaries of Ferrous and also have headquarters at 10 Merrymount. Ex. C (Realty Resp. Request For Admission ("RFA") 2); Answer ¶ 9. Frank Gangi is the sole shareholder, officer, and director of Ferrous. Answer ¶ 8; Ex. B (F. Gangi Dep.) at 26.

Frank is the president of all the Global NAPs companies, as well as an officer and director of each company. Ex. B (F. Gangi Dep.) at 24; Ex. E (12/1/08 F. Gangi Evid. Hearing) at 32-33. The only other officer and/or director of the Global companies is Michael Couture, Frank's brother-in-law. Ex. C (Realty Resp. RFA 5); Ex. B (F. Gangi Dep.) at 26. Gangi is also the president, sole officer and director, and sole shareholder of Sahara, which is also a wholly owned subsidiary of Ferrous and also headquartered at the 10 Merrymount address. Ex. D (Sahara Resp. RFA 2, 4, 6); Ex. B (F. Gangi Dep.) at 41.

Richard has admitted that Ferrous had "a slew of other Global NAPs companies that I call file companies," which "are various companies in various states that are filed just for regulatory reasons" but "don't actually do anything," "have no assets," "have no employees," and are just "a file company."  Ex. A (5/31/06 R. Gangi Dep.) at 44; *see also Illinois Bell Tel. Co. v. Global NAPs Illinois, Inc.*, 551 F.3d 587, 597 (7th Cir. 2008) (referencing testimony).  These file companies "don't do much of anything, so my day to day activities, you know, they don't exist in my head."  *Id.* at 45.  Frank similarly admitted that "there are probably five hundred corporations with my name on them," and "I am the President of probably two hundred corporations set up by our counsel," including "regulatory" companies set up for "tax reasons" or "regulatory reasons" that "may have no assets" and "may have no income," but "may be just what we call a file drawer company."  Ex. F (6/21/05 F. Gangi Dep.) at 116-19; *see also* Ex. B (F. Gangi Dep.) at 18; *Illinois Bell*, 551 F.3d at 597 (referencing testimony).

At least two other federal courts have held that the various Global NAPs entities are alter egos of Global Inc.  In the Connecticut Action, the district court, as part of its default judgment, held that the various Global NAPs defendants—Realty, Global NAPs Networks, Inc., Global NAPs New Hampshire, Inc., and Ferrous Miner—were alter egos of Global Inc.  *SNET v. Global NAPs, Inc. et al.*, 251 F.R.D. 82, 96 (D. Conn. 2008).  Based on that holding, a second federal court in Georgia held that "GN New Hampshire and Ferrous Miner are collaterally estopped from challenging that they are alter egos of GNAPs" and held that those defendants were alter egos of Global Inc.  Doc No. 38, *SNET v. 1003 Donnelly Ave., Inc. et al.*, Case No. 08 CV 03816 (D. Ga. Sept. 2, 2009).  Moreover, the Seventh Circuit Court of Appeals, in another case involving the GNAPs entities, similarly observed that the GNAPs corporate structure "appears to be designed to keep all its assets in corporations that have no liabilities and all its liabilities in corporations that have no assets."  *Illinois Bell,* 551 F.3d at 597.

2.      Realty

Frank created Realty over ten years ago and, to the best of his recollection, he provided Realty's initial funds.  Ex. B (F. Gangi Dep.) at 32.  Realty oversees real estate operations for the Global NAPs companies and leases property on their behalves.  *Id.* at 34-35.  Between at least 1998 and 2007, Realty entered into numerous multi-year leases, incurring large liabilities to lease property used by the Global NAPs enterprise in the conduct of its telecommunications business.  Realty leases at 1-723 [no prefix]; Ex. B (F. Gangi Dep.) at 95-96.  For example, in 1998, Realty entered into a multi-year lease for 10 Merrymount, Quincy, MA, where all defendants are headquartered, at a cost of approximately $201,300 per year.  Realty leases at 648-85.  In 2005 alone, Realty was contractually obligated to pay, at a minimum, $86,000 per month in rental payments.  *Id.* at 1-723.  Realty apparently also leases space to third-party customers, but Realty's corporate representative (Frank) could neither specify how many customers Realty served nor point to any documents identifying these customers.  Ex. B (F. Gangi Dep.) at 36 (guessing that Realty had "between zero and a hundred customers" in 2005 and having "no idea" how many customers Realty has today).

3.      Sahara

Sahara was incorporated in 2002, utilizing funds provided personally by Frank.  Ex. D (Sahara Resp. RFA 1); Ex. B (F. Gangi Dep.) at 40-41.  Frank is, and has been, the only officer or director for Sahara and refers to himself as a "one-man band."  *Id.* at 26, 29, 73-74; Answer ¶ 9. Any board "meetings" thus involve Frank Gangi acting alone:  "Sahara is just me" [and] I meet with myself all the time."  Ex. B (F. Gangi Dep.) at 39.  Sahara has no business operations other than its ownership of the property and had no business operations prior to the conveyance of the property to it.  Ex. D (Sahara Resp. RFA 35, 36); *see also* Ex. B (F. Gangi Dep.) at 40 (Sahara "doesn't engage in trade or business" and "just sits there.").  Sahara has no assets other than the property.  Ex. D (Sahara Resp. RFA 24, 25).  It has no income or revenues.  *Id.* at RFA

26, 27, 28;  Ex. B (F. Gangi Dep.) at 74.  It has no bank account.  Ex. D (Sahara Resp. RFA 11, 12); Ex. B (F. Gangi Dep.) at 21, 61.   In other words, Sahara is merely what Richard Gangi referred to as a "file company."  Ex. A (5/31/06 R. Gangi Dep.) at 44; *see also* Ex. B (F. Gangi Dep.) at 21 ("Neither one of these companies [Realty and Sahara] have particularly a lot of documents to keep because they just don't do much.").

4.      Defendants' Recordkeeping

Neither Realty nor Sahara files its own federal tax returns; rather, Ferrous files a consolidated return on behalf of all of its entities.  Ex. B (F. Gangi Dep.) at 142.  Before 2006, none of the Global entities kept separate financial records.  Instead, all assets and liabilities were commingled and the separate entities were treated as one larger entity, with no effort to separate them.  Ex. A (5/31/06 R. Gangi Dep.) at 35.  As the then-treasurer Richard testified in 2006, he was not provided and had never seen financial statements for any of the Global NAPs entities because "[a]ll these companies are sub Q's of Ferrous Miner Holdings, so everything is pushed up to Ferrous Miner and Ferrous Miner does generate that."  *Id.*

C.      **Acquisition of the Las Vegas Property in 2000**

In 2000, one of the Global NAPs entities acquired the Las Vegas Property, which is a vacant lot.  The documentation is unclear as to which entity was the actual buyer.  Despite being the defendants' 30(b)(6) representative, Frank did not know at his deposition which entity acquired the property, although he speculated in turn that "I think I had Realty acquire it originally" (Ex. B (F. Gangi Dep.) at 158), and, later, that Global Inc. had provided the funds for the purchase as a "payment to [Frank] against the money that I loaned to Global [Inc.]"), and, still later, that "Ferrous Miner was a straw buyer" (*id.* at 164).  In Frank's view, "[w]e, Global, Inc. and I, understood what the transaction was all about" and "[t]hat's all that mattered."  *Id.* at 161.  As Frank explained:

1

2

3        [T]hese are companies that I own directly or indirectly.  I keep
         track of money that I've lent between them myself.  You know, it's
         an internal thing.

4

5    *Id.* at 187.

6        **D.    Conveyance of the Las Vegas Property in 2005**

7        On November 15, 2005, Realty transferred the property to Sahara by quitclaim deed,

8    which was recorded.  Ex. G (Realty-NV 0002-5).  According to Frank, Realty conveyed the Las

9    Vegas Property in 2005 for "liability" reasons:

10       A.     Realty decided it no longer wanted to be an owner of the
         property, and I didn't want to have my property owned by Realty.
         I wanted them to be separate entities.  I didn't want all my eggs in
11       one basket.

12       Q.     And why is that, sir?

13       A.     Liability. You don't—you know, if somebody trips and
         falls in one facility, they can't sue them over another facility.

14

15   Ex. B (F. Gangi Dep.) at 175-76; *see also id.* at 179 ("[W]e had a discussion internally at some

16   point to separate the ownership of the property from Realty . . . to nonoperating entities and

17   that's what we did.").

18       At or about this same time, Realty specifically, and the Global NAPs companies

19   generally of which Realty is a part, had been named as a defendant in several lawsuits.  Realty

20   itself was a defendant in *Cole, Raywid & Braverman, L.L.P. v. Global NAPs, Inc., et al.*, Civil

21   Action No. 04-02008 (Mass. Norfolk Super. Ct. Nov. 22, 2004).  In addition, one or more of the

22   related "Global NAPs" entities was named in the following cases pending as of November 15,

23   2005:

24       • The Connecticut Action brought by SNET, in which Realty was later added as a
           defendant.

25       • *Verizon New York Inc., et al. v. Global NAPs, Inc. et al.*, Civil Action No. 03-CV-
           5073 (E.D.N.Y. Oct. 7, 2003) (Block, J.) (Realty was later added as a defendant.)

26

27

28

8

- Answer and Counterclaims of Defendant BellSouth Telecommunications, Inc., *Global Naps North Carolina, et al. v. BellSouth Telecommunications, Inc.*, Case No. 5:04-CV-96-BO (E.D. N.C. Mar. 9, 2004).

- *Global NAPs, Inc. v. Verizon New England Inc. v. Global NAPs New Hampshire, Inc., et al.,* Case Nos. 02-12489-RWZ, 05-10079-RWZ (D. Mass. Mar. 14, 2005) (Realty was later added as a counter-defendant)

- *Pacific Bell Telephone Company d/b/a AT&T California v. Global NAPs California, Inc., Case No. BC 340361* (Cal. Super. Ct. Sept. 23, 2005) (Realty was later added as a defendant, after the case was removed to federal court)

- *Request for Expedited Declaratory Ruling As To the Applicability of the Intrastate Access Tariffs of Blue Ridge Telephone Company, Citizens Telephone Company, Plant Telephone Company, and Waverly Hall Telephone LLC to the Traffic Delivered to Them By Global NAPs, Inc*., Case No. 21905-U (Georgia Public Service Commission Nov. 16, 2005).

Moreover, at least one judgment already had been entered against Realty's alter ego, Global Inc., and others were entered against other Global NAPs entities shortly after Realty conveyed the property to Sahara.  In December 2004, the Cole, Raywid law firm obtained $250,000 in prejudgment relief against Global Inc. on its claim that the Global NAPs defendants had failed to pay over $2 million in legal bills.  Ex. H (12/14/04 Docket Order and Summons to Trustee).  In April 2006, SNET obtained a prejudgment remedy of $5.25 million against Global Inc. in the Connecticut case. Doc. No. 133 (May 5, 2006 Order) in Connecticut Action.

Sahara did not purchase the property from Realty with cash; rather, Sahara received the property in exchange for agreeing to take on $240,000 worth of debt that Realty owed to Frank. *See* Ex. B (F. Gangi Dep.) at 189 ("Realty's debt to me was extinguished and then a new debt was created with Sahara and—Sahara and Arden from them to me.  So Realty no longer had that debt, you know, and that was the consideration.  The debt was gone."); *see also* Ex. C (Realty Resp. RFA 11).  There are no documents reflecting this purported consideration, other than the "purchase and sale" documents (Ex. B (F. Gangi Dep.) at 189) (and those documents simply reflect a value of $240,000 and nothing more).  Frank simply "just knows that there is" consideration, because he is the "sole shareholder ultimately of Sahara and Arden. I'm the sole

officer and director, and I know what we did." *Id.* at 191; *see also id.* at 192 (Frank describing himself as being in the "unique position to know exactly what my understanding is of the agreement I made with myself.").

There are no loan agreements between the defendants, nor has Sahara recorded interest expense in connection with the conveyance. Ex. B (F. Gangi Dep.) at 191-92. No promissory notes exist. *Id.* at 191. Indeed, Sahara has no revenues, no assets other than the Las Vegas property, no operations and no income, so it has no ability to repay the "loan" from Realty. *Id.* at 22, 40, 75, 176, 191; *see also* Ex. D (Sahara Resp. RFA 26-28). As a result of the Global NAPs entities' failure to maintain separate records until 2006, and the fact that the Global NAPs defendants, including Realty, had "willfully destroyed or hidden financial documents"(*SNET*, 251 F.R.D. at 93), there are few documents pertaining solely to Realty on or about the time of the transaction in November 2005. For example, Frank, Realty's 30(b)(6) witness, testified that he did not know whether Realty had a bank account at the time of the conveyance of the property in 2005 (Ex. B (F. Gangi Dep.) at 51), and defendants did not produce any documents establishing that fact one way or the other.

Frank also testified that Realty did not keep any "accounting records," even though, in its response to a request to admit, Realty denied that Realty "kept no accounting records." Ex. C (Realty Resp. RFA 21). According to Frank, Realty does not retain copies of its financial records; rather, only certain documents are retained by its outside bank. Ex. B (F. Gangi Dep.) at 21-22. When asked at this deposition to identify the assets that Realty had as of the date of the conveyance in November 2005, Frank's response was that "I can't tell you with specificity." *Id.* at 80. When asked to identify the documents that would reflect Realty's assets, Gangi referenced "invoices or cancelled checks" in relation to Realty's personal property—none of which were produced and, according to counsel, no longer exist—and "deeds" in relation to Realty's real property—again none of which were produced. *Id.* at 81.

1

2

3        Neither party performed an appraisal of the property's worth in connection with the

4    transfer. Ex. D (Sahara Resp. RFA 40); Ex. C (Realty Resp. RFA 1). Sahara did not conduct a

5    title search prior to the conveyance. Ex. D (Sahara Resp. RFA 39). Instead, brothers Richard

6    and Frank, as seller and buyer, respectively, unilaterally determined to transfer the property and

7    at what value. Ex. B (F. Gangi Dep.) at 181 ("[M]y brother was the seller and I was the buyer

8    and that's the number we came up with and agreed on."). Sahara did not conduct any

9    independent review of what the property was worth. *Id.* at 184 ("these are related parties that

10   know one another" and "trust one another."). Again, despite being deposed as both Realty and

11   Sahara's 30(b)(6) representative, Frank did not know on which entity's accounting records the

12   property is reflected. Ex. B (F. Gangi Dep.) at 200. Moreover, in connection with the

13   conveyance, the defendants sought an exemption from the State of Nevada from the real property

14   transfer tax that otherwise would have been due on the basis that the "[p]roperty [is] being

15   transferred between companies with identical ownership." Ex. I (SNET-NV0006).

16       However, Nardella & Taylor—the long-time accountants for all of the Global NAPs

17   entities (Ex. B (F. Gangi Dep.) at 91)—produced 2005 and 2006 trial balance sheets in the

18   Connecticut action. ██████████████████████████████████████

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ████[1]   Emails produced by the Global NAPs entities reflect that the property is owned by

22   [1]   Although Gangi attempted at his deposition to dismiss the adjusted trial balance report as an
     unsubstantiated document, the evidence is to the contrary. In the Connecticut Action, SNET deposed Ed

23   Taylor of Nardella & Taylor, the accountant for all of the Global NAPs entities, including Realty. Mr.
     Taylor testified that another accountant, Joan Conway, had prepared the adjusted trial balances, using

24   information provided by the defendants: "She was given a trial balance off the accounting system that the
     [Global] companies have." Ex. Q (Taylor Dep.) at 115-16.

25       SNET also deposed Ms. Conway, who testified that she did accounting work for the Global NAPs
     parties for many years, first as an employee of Nardella & Taylor, and then at other Frank Gangi-owned

26   companies until she returned to Nardella & Taylor to assist in the preparation of the 2006 adjusted trial
     balance reports. Ex. R (1/18/08 Conway Dep.) at 15-16, 19-20, 23, 31-41. Ms. Conway testified that,

27   acting under the direction of Janet Lima, a former Global NAPs employee who then started her own
                                                                                          (cont'd)

28

Global Inc.  Ex. L (7/20/06 email from Joan Conway) (". . . Global Naps, inc [sic] still holds the fixed assets.  Removing the land and buildings from Global Naps, Inc to other entities is only going to create a receivable from that company because Global Naps, Inc money was used to make the original purchase.").  The 2008 tax bill for the property was paid from the bank account of yet another Global NAPs entity called Global NAPs Financial Services, Inc., and the payment was made on behalf of Global Inc.  Ex. M (GNAPS OH2-36847); Ex. N (GNAPS OH2-36797).  The official records of the Clark County, Nevada Assessor reflect that the tax invoices are sent to Richard Gangi's attention, even though he was listed as the seller in the 2005 transaction with Sahara, not the buyer (and even though he is deceased).  Ex. O (Sahara 0029-34).

At the time of the 2005 transfer of the Las Vegas Property, Realty was insolvent, as the 2005 consolidated tax return of Ferrous, ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████

A July 7, 2006 email from the Chief Financial Officer of the Global NAPs entities states that:

> Generally I see the companies shaping up this way:  NH [Global NAPS New Hampshire] has no revenue (although in the future it may earn fees for service) or expenses.  Other than for timing differences, it should have no assets or liabilities.  Networks is the largest of the companies, is profitable and *Inc. and Realty are the*

___

company and provided bookkeeping services to the Global NAPs entities, she and Ms. Lima set up a chart of accounts and general ledger for Global NAPs, and that she and Ms. Lima maintained the general ledger on a computer at the GNAPs headquarters.  *Id.* at 76-77.  According to Ms. Conway, she would use the information that was entered into the GNAPs accounting system to manually re-enter information into Nardella & Taylor's computer to create the separate adjusted trial balance reports used by Ed Taylor to prepare the tax returns.  *Id.* at 32-33, 40-42, 54-55.

> *smaller companies and currently show losses.*  In the future, it
> might be best to show some profits in Inc. and Realty, just to
> demonstrate that these are commercially reasonable entities.

Ex. V (7/7/06 email from Ann Hartman) (emphasis added); *see also* Ex. S (5/27/06 email from F.
Gangi to Global NAPs' CFO, stating that "GNAPs Inc. does not have 5.2 [million] worth of
assets anywhere").

By the time of the conveyance of the Las Vegas Property, Realty had transferred its two
remaining properties under virtually identical terms.  In December 2004, Realty transferred a
building in Massachusetts to an entity called 1120 Hancock Street, Inc., which is wholly owned
by Ferrous Miner, but which Frank testified that he continues to "hold" as a "corporate shell."
Ex. T (1120 Hancock transfer); Ex. E (12/1/08 F. Gangi Evid. Hearing) at 75.  In April 2005,
Realty transferred a building in Atlanta to an entity called 1003 Donnelly Avenue, Inc., which
also is wholly owned by Ferrous Miner or Frank.  Ex. U (1003 Donnelly transfer).  Both of these
transfers were designed like the one at issue here, with no cash changing hands.  Ex. B (F. Gangi
Dep.) at 84 ("There was a debt to me that was owed to me by Realty regarding that property, and
the debt to Realty to me was extinguished and then was recreated by --assumed by the . . .
Hancock Street entity."); *id* at 89 (Atlanta transfer involved "essentially" the "same sort of
setup" where the purported consideration was the "extinguishing of the mortgage for the money I
provided").

## II.   STANDARD OF REVIEW

Summary judgment allows courts "to avoid unnecessary trials when there is no dispute as
to the facts." *N. W. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir.1994);
*Lopez v. American Family Mut. Ins. Co.*, 2009 WL 2105709 at *4 (D. Nev. July 13, 2009)
(Jones, J.).  The court must view the evidence and the inferences arising therefrom in the light
most favorable to the nonmoving party, *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996),
and should award summary judgment where no genuine issues of material fact remain in dispute

and the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(c).  Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Lopez*, 2009 WL 2105709 at *4.

## III.   ARGUMENT

Under Nevada law, a transfer by a debtor "is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made," if the debtor made the transfer "with actual intent to hinder, delay or defraud any creditor of the debtor."  Nev. Rev. Stat. § 112.180(1)(a) (Nevada Uniform Fraudulent Transfer Act, or "Uniform Act").[2]  Thus, where actual intent to defraud creditors is proven, the conveyance will be set aside regardless of the adequacy of consideration exchanged.  Moreover, even where no actual fraud exists, a court will overturn a conveyance if there has been "constructive fraud," which occurs when the debtor did not receive "reasonably equivalent value in exchange for the transfer," and the debtor "(1) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  Nev. Rev. Stat. § 112.180(1)(b).  As will be shown below, the undisputed facts in the record establish both actual and constructive fraud as a matter of law.

---

[2]  Nevada's version of the Uniform Act does not differ in any material respects from the standard Uniform Act.  Forty-three states and the District of Columbia have enacted versions of the Uniform Act.  Cases from other jurisdictions interpreting uniform acts are deemed persuasive by Nevada courts.  *See Waldman v. Maini*, 195 P.3d 850, 860 (Nev. 2008) ("Because the Act is a uniform act applied in many states, the jurisprudence of sister jurisdictions applying the Uniform Act is highly persuasive") (applying Uniform Simultaneous Death Act); see also *Sportsco Enters. v. Morris,* 917 P.2d 934, 938 (Nev. 1996) (Uniform Fraudulent Transfer Act case citing opinions from California, Colorado, and Montana state courts).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.      The Conveyance of the Las Vegas Property Was Actually Fraudulent.**

      1.      SNET Has Established a Majority of the "Badges" of Fraud as a Matter of Law.

Realty's conveyance of the Las Vegas Property—with not a single document to reflect the purported consideration and done at a time when lawsuits against Realty and the other Global NAPs companies were mounting—is actually fraudulent.

"Traditionally, the intent required for actual fraudulent transfers is established by circumstantial evidence, since it will be the rare case in which the debtor testifies under oath that he or she intended to defraud creditors." *In re Nat'l Audit Defense Network,* 367 B.R. 207, 219-20 (Bankr. D. Nev. 2007).  In this regard, courts have developed "badges of fraud"—that is, circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent. *Id.* at 220.

The Nevada Uniform Act identifies 11 non-exhaustive badges as follows:

      (1) the transfer or obligation was to an insider;

      (2) the debtor retained possession or control of the property transferred after the transfer;

      (3) the transfer or obligation was disclosed or concealed;

      (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

      (5) the transfer was of substantially all the debtor's assets;

      (6) the debtor absconded;

      (7) the debtor removed or concealed assets;

      (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

      (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

      (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

1
2
3

> (11) the debtor transferred the essential assets of the business to a
> lienor who transferred the assets to an insider of the debtor.

4
5
6
7
8
9

Nev. Rev. Stat. § 112.180(2)(a)-(k).  Although the "presence of a single factor, *i.e.* a badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud."  *Gilchinsky v. Nat'l Westminster Bank,* 732 A.2d 482, 490 (N.J. 1999); see also *In re Nat'l Audit Def.,* 367 B.R. at 220 ("Although none of the badges standing alone will establish fraud, the existence of several of them will raise a presumption of fraud.") (quotation marks and citation omitted).

10
11
12
13
14
15
16
17

Once the creditor produces evidence of "certain indicia or badges of fraud, the burden shifts to the defendant to come forward with rebuttal evidence that a transfer was not made to defraud the creditor."  *Pat Clark Sports, Inc. v. Champion Trailers, Inc.*, 487 F.Supp.2d 1172, 1177 -1178 (D. Nev. 2007); *see also Sportsco*, 917 P.2d at 938 (same); *U.S. v. Mantarro*, 1992 WL 551483 at *4 (N.D. Ohio June 19, 1992) ("[T]he proof of indicia or badges of fraud may give rise to an inference or presumption which "shifts" the burden of proof-that is, which makes it incumbent upon the transferee or defendant to go forward with the proof and explain the transaction.").  As the Seventh Circuit has observed:

18
19
20
21
22

> Where all circumstantial evidence points to fraudulent intent, at
> least some of it has to be explained away. Neither summary
> judgment nor directed verdict can be avoided by simply saying,
> "nevertheless, it is not so.". . . Because the [defendants] fail[ ] to
> indicate any motive or intent to support [their] position" of
> innocent conveyance, . . . the judgment [against defendants] is
> affirmed.

23
24
25
26

*U.S. v. Denlinger*, 982 F.2d 233, 237 (7th Cir. 1992) (internal quotes and citation omitted); *see also In re Prosser*, 2009 WL 3270765 at *13 (Bankr. D.V.I. 2009) ("Where the defendants have not established sufficient facts to rebut the presumption of a fraudulent transfer, summary judgment is appropriate.").

27
28

16

a.      Realty transferred the property to an insider.

Here, it is undisputed that the transfer was to an insider.  Not only is it clear as a matter of fact that the transfer was from one Ferrous Miner- (and thus Frank Gangi)-controlled company to another, but it is also clear as a matter of law that relationships of this sort are deemed insider for purposes of the Uniform Act.

The Uniform Act expressly defines "insider" to include "an affiliate."  Nev. Rev. Stat. § 112.150(7)(d).   "Affiliate," in turn, is defined as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote, by the debtor or a person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor." *Id.* § 112.150(1)(b).

Under this definition, Sahara is undisputedly an affiliate of Realty (and all the Global NAPs entities) and therefore an insider.  Both Realty and Sahara are wholly owned by Ferrous Miner, which is wholly owned by Frank Gangi.  Realty and Sahara share the same president (Frank).  They share the same director and officer (Frank is the sole officer and director of Sahara and one of two of Realty, along with Frank's brother-in-law).  They share the same decision-maker (Frank).   In short, because both defendants share the identical ownership structure (and near-identical management structure), there is no question that Sahara is an insider.  See *In re Nat'l Audit Def.*, 367 B.R. at 221 (corporations were "affiliates" and thus "insiders" of debtor where corporations were controlled and owned by officers of debtor) (applying Nevada statute and voiding transfers after bench trial); *Scott Dugas Trucking & Excavating, Inc. v. Homeplace Building & Remodeling, Inc.*, 1994 Me. Super. LEXIS 175 at *12-13 (Me. Super. Ct. 1994) (holding that a corporation was an "affiliate" of a second corporation and thus an "insider," where the same person was the primary shareholder of both); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. Ct. App. 2002)

(corporation was an "insider" of another corporation based on "common ownership and management" where the two companies were wholly owned by the same individual).

The case of *South Side Nat'l Bank v. Winfield Fin. Servs. Corp.*, 783 S.W.2d 140 (Mo. Ct. App. 1989), decided under Missouri's Uniform Act, is particularly instructive. There, the same individual (a Robert Scott) was the president, sole shareholder, and lone director of both Winfield Investment Company, Inc. ("Winfield Investment") and Winfield Financial Services Corporation ("Winfield Financial"). *Id.* at 141-42. The plaintiff filed suit against Scott and Winfield Investment. On the eve of trial, Winfield Investment transferred 14 vacant lots to Winfield Financial. The lots were allegedly transferred between the companies in partial satisfaction of a $145,650 pre-existing debt, and, after the transfers, Winfield Investment and Robert Scott were both left without any assets. *Id.* at 142.

The court held that the property transfers at issue constituted actual fraud and remanded to the trial court to set aside the conveyance as void. The court observed that the buyer and seller were "controlled by the same person" and that the "legal fiction of the independent existence of the corporate entity will be disregarded where two corporations are being manipulated through their interrelationship to cause illegality, fraud or injustice." *Id.* at 144. The transfers were "equivalent to Scott's juggling the properties from himself to a corporation and from one corporation to another corporation merely to avoid obligations to a third party." *Id.* In the court's view, "Scott was the alter ego of the corporations and the corporations were a subterfuge." Because Scott was the "alter ego of the two corporations, he was effectively transferring the properties in question to himself." *Id.*

Here, too, Frank essentially has transferred the property in question to himself. Indeed, at his deposition, Frank relied upon the close relationship between Realty and Sahara in explaining why Sahara did not feel it necessary to conduct its own independent review of the value of the property it was acquiring:

> [T]hese are related parties that know one another. They trust one another. Am I going to steal from myself? I'm the ultimate owner of Realty. I'm the ultimate owner of Sahara."

Ex. B (F. Gangi Dep.) at 184. He also justified the lack of any documentation regarding the purported consideration for the transfer on the parties' close status. *Id.* at 191-92 (Gangi "just know[s] that there is" consideration because he is the "sole shareholder ultimately of Sahara and Arden," he is the "sole officer and director, and I know what we did" and is in the "unique position to know exactly what my understanding is of the agreement I made with myself."). Moreover, in connection with the conveyance, the defendants sought an exemption from the State of Nevada from the real property transfer tax that otherwise would have been due on the basis that the "[p]roperty [is] being transferred between companies with identical ownership." Ex. I (SNET-NV0006).[3] This badge of fraud is amply satisfied.

> b.   The Global NAPs entities retained possession and control of the property after the transfer.

Here, too, the documents establish as a matter of law that the purported transfer had no effect whatsoever on the identity of the property's owner. ████████████ ████████████████████████████████████████████████████ ████████████████████████████████ The tax bills are currently directed to the now-deceased Richard Gangi, who was the seller of the property—not the buyer—and are paid by Global NAPs Financial Services on behalf of Global Inc. Ex. M (GNAPS OH2-36847); Ex. N (GNAPS OH2-36797). Put differently, the "only differences in the properties which existed after the transfers were the names in which the parcels were titled." *South Side,* 783 S.W.2d at 144; see also *Davis v. Davis*, 1996 Mich. App. LEXIS 1268 at *7 (Mich. Ct. App. 1996) (finding among the "[m]ost compelling" badges of fraud the fact that defendant

---

[3]  As referenced above (at p. 5, *supra*), at least two other federal courts have held that the various Global entities are alter egos of Global Inc.

19

"continued to use the property as if he owned it" after assignment, including his continuing to pay taxes on the property); *Gabaig v. Gabaig*, 717 P.2d 835, 839 (Alaska 1986) (finding transferor retained premises and "acted as if he were the true owner" where he continued to pay taxes on property).

          c.      Before the transfer was made, Realty had been sued or threatened with suit.

Another badge of fraud is if, before the transfer of the property, the debtor had been sued or threatened with suit.  The lawsuits do not need to be brought by the same creditor seeking to set aside the fraudulent conveyance; any lawsuit will do, because it serves to put the debtor on notice that it may be called upon to satisfy a judgment.  *Sportsco*, 917 P.2d at 938 (noting that debtor was "a defendant or potential defendant in a number of pending or threatened lawsuits regarding his debts.").  Similarly, a lawsuit "counts" for purposes of the Uniform Act regardless of whether it is brought against the debtor or a company closely connected with the debtor.  *E.g.*, *In re Prosser*, 2009 WL 3270765 at *10-11 (finding fraud where litigation was pending against debtor's predecessor corporation as well as its parent, although debtor itself was not a defendant to those suits at the time of the challenged transfer).

At the time of the November 2005 transfer of the property, both Realty specifically and the Global NAPs family generally of which Realty is an alter ego had been sued several times. Realty itself was a defendant in at least one case (*Cole Raywid*) as of November 15, 2005.  In addition, one or more of the related "Global NAPs" entities had been named in at least six cases or administrative proceedings as of November 15, 2005 (and Realty was later added as a defendant or counter-defendant in four of them).  *See* pp. 8-9, *supra* (discussing cases); *see also* Ex. S (May 2006 email from Frank to the CFO of the Global NAPs entities: "we are involved in many court battles").

In light of this extensive list—which does not even include threatened litigation—it is simply incredible that Realty would deny, as it did, that it "had been sued or threatened with suit at the time of the conveyance." Ex. C (Realty Resp. RFA 28).

d.     The defendants concealed assets.

Although the quitclaim deed evidencing the conveyance of the property was recorded with the state of Nevada (Ex. G (Realty-NV 0002-5)), that fact alone does not insulate the conveyance from suspicion. Rather, courts have deemed a transfer to be concealed for purposes of a fraudulent transfer analysis where the formal documentation did not reflect the actual circumstances surrounding the transfer.

For example, in *In re Prosser*, 2009 WL 3270765, the defendant had duly recorded the deed evidencing the conveyance of the property. *Id.* at *9. However, the court determined that the transfer nevertheless was concealed, because the defendant had not revealed "sufficient information that would put creditors on notice of the fraudulent nature of the transaction." *Id.* at *8-9 (noting, among other deceptive practices, that the debtor's board was not apprised of the transfer; the defendants' audited financial statements were "misleading," delayed, and "inaccurately described the transfer"; and the promissory note signed by the insider transferee was not available to the public).

Here, too, the true circumstances of the transfer are not revealed by the publicly filed quitclaim deed and declaration of value. The declaration reflects only a value of $240,000 for the property being transferred, which is undisputedly not the whole story. Ex. G (Realty-NV 0005). The document contains no mention of a loan that is being transferred from one insider to another. Nor could creditors discover the true consideration paid for the transfer, as defendants have not identified or produced any other document that reflects any consideration paid for the transfer. Thus, another badge of fraud is present.

1

2

3                    e.          There was no consideration.

4          It is clear that there was no consideration for the transfer of the property to Sahara.

5   Indeed, defendants cannot point to a single document that establishes that the transaction was

6   fair, rather than one Frank Gangi-controlled company moving a property to another Frank Gangi-

7   controlled company in order to insulate that property from creditors.

8          Under Nevada law, satisfaction of an antecedent debt can constitute fair consideration,

9   but only if the antecedent debt is valid and existing.  *Pat Clark Sports*, 487 F. Supp.2d at 1179;

10  Nev. Rev. Stat. § 112.170.   As courts have long held, proper documentation of the debt is

11  necessary.  *See In re Nat'l Audit Def.,* 367 B.R. at 225-26 (rejecting debtors' arguments that

12  transfer was made in payment of a pre-existing loan by noting that debtors could not "connect[]

13  these notes to any particular transfer" and that "[t]his failure to link specific transfers with

14  alleged loan repayments is fatal"); *Swinford v. Teegarden*, 60 S.W. 1089, 1091 (Mo. 1901)

15  (holding that there was inadequate consideration based on the partial satisfaction of an

16  antecedent debt because a "careful examination of the testimony fails to show sufficient data to

17  state an indebtedness . . . and the testimony offered by the defendants on this subject *is so vague,*

18  *general and wanting in details that it is impossible to state any account between them or to*

19  *afford a reasonable basis of calculation*") (emphasis added).   Moreover, when parties are alter

20  egos of each other, courts have found no valid consideration for the satisfaction of antecedent

21  debts.  *South Side*, 783 S.W.2d at 144 (actual fraud where debtor conveyed properties from one

22  corporation to another; he was the "alter ego of both corporations and his conveying the

23  properties to repay an indebtedness was tantamount to satisfying a debt to himself.").

24         Here, too, Realty purportedly transferred the property to Sahara in exchange for Sahara

25  agreeing to take on a debt that Realty owed to Frank Gangi.  Ex. B (F. Gangi Dep.) at 189; *see*

26  *also* Ex. C (Realty Resp. RFA 11).   There are no documents reflecting this purported

27  consideration, other than the "purchase and sale" documents (Ex. B (F. Gangi Dep.) at 189), and

28

those documents reflect a value of $240,000 and nothing more (Ex. G (Realty-NV 0005)). Although Gangi "just knows that there is" consideration, because he is the "sole shareholder ultimately of Sahara and Arden. . . and I know what we did" (Ex. B (F. Gangi Dep.) at 191-92), that simply is not enough.

Further causing the transfer to be viewed as suspect, there are no loan agreements evidencing the transaction, nor has Sahara recorded an interest expense in connection with the conveyance. *Id.* No promissory notes exist. *Id.* at 191. Indeed, Sahara has no revenues, no assets other than the property, no operations, and no income, so it has no ability to repay the "loan" from Realty. Ex. D (Sahara Resp. RFA 11, 12, 24-28). *Cf. Johnston City State Bank v. Sowell*, 1934 WL 2951, at *4 (Ill. App. Ct. Sept. 6, 1934) (upholding finding of fraudulent transfer where, *inter alia*, no memorandum of debt had been prepared and no interest had been demanded or paid, notwithstanding a lapse of seven years; such circumstances "cast[] suspicion upon the good faith of a conveyance").

Moreover, neither Sahara nor Realty performed an appraisal of the property in connection with the transfer. Ex. D (Sahara Resp. RFA 40); Ex. C (Realty Resp. RFA 1). Sahara did not conduct a title search prior to the conveyance. Ex. D (Sahara Resp. RFA 39). Instead, brothers Richard and Frank unilaterally determined to transfer the property and at what value, without conducting any independent review. *See* Ex. B (F. Gangi Dep.) at 181 ("My brother was the seller and I was the buyer and that's the number we came up with and agreed on."); *see also id.* at 184 ("these are related parties that know one another" and "trust one another."). Again, that is not enough. *See Textron Fin. Corp. v. Kruger*, 545 N.W.2d 880, 884 (Iowa Ct. App. 1996) (holding that transfer was fraudulent where, *inter alia*, the transferor did not take "any steps to independently determine" the land's value, and the transferee relied only upon the opinion of his attorney, "who was unable to explain or justify his opinion").

1

2

3                  f.      Realty was insolvent or became insolvent shortly after the transfer
        was made.

4         At his deposition, Frank testified that Realty was profitable at the time of the conveyance,

5

6    based on his "knowledge running around the building."  Ex. B (F. Gangi Dep.) at 77.  This self-

7    serving testimony, however, is flatly at odds with the documentation establishing that Realty was

8    operating at a loss in 2005.

9         Under Nevada law, a party is deemed insolvent if, inter alia, "the sum of the debtor's

10   debts is greater than all of the debtor's assets at a fair valuation."  Nev. Rev. Stat. § 112.160; *see*

11   *also RTC Mortg. Trust v. Sopher*, 171 F.Supp.2d 192, 240 (S.D.N.Y. 2001) (defendant insolvent

     where the "company's liabilities exceeded its assets").

12        Here, Realty's failure to keep separate records in 2005 raises an inference of insolvency,

13

14   one made even stronger by Realty's and Global NAPs' subsequent destruction of financial data

15   documents.   However, the few documents that do exist—and were produced by Realty's

16   accountants—confirm that Realty was insolvent in 2005.  ███████████████████

17   ████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████

22   ████████████████

23        In a July 2006 email, the CFO of the Global NAPs entities admits that "[Global] Inc. and

24   Realty are the smaller companies and currently show losses."  Ex. V (7/7/06 email from Ann

25   Hartman).  And shortly after the Connecticut court granted SNET a $5.25 million prejudgment

26   remedy in April 2006, Frank sent an email to the Global NAPs CFO, stating that "GNAPs inc.

27   [sic] does not have 5.2 [million] worth of assets anywhere."  Ex. S (5/27/06 email from F.

28   Gangi); *Cf. Graham v. Henry*, 456 N.W. 2d 364, 366 (Iowa 1990) (stating that insolvency "may

be inferred from circumstantial evidence, if not direct proof," including default on contracts and admissions that the debtor needed money to cover debts).

Moreover, between at least 1998 and 2007, Realty entered into numerous multi-year leases, incurring large liabilities to lease property used by the Global NAPs enterprise. Realty leases at 1-723; Ex. B (F. Gangi Dep.) at 95-96. In 1998, Global NAPs Realty entered into a multi-year lease for 10 Merrymount, Quincy, MA, where all defendants are headquartered, at a cost of approximately $201,300 per year. Realty leases at 648-85. In 2005 alone, Realty was contractually obligated to pay a minimum of $86,000 per month in rental payments. Realty leases at 1-723.

In the face of this evidence, Frank's response is to insist that Realty is profitable, based on the fact that he "walk[s] around the building all day long." Ex. B (F. Gangi Dep.) at 149. However, a party's subjective belief that is clearly contradicted by the evidence is insufficient to create a genuine issue of material fact. Moreover, Frank's basis for his conclusion—the "lack of people suing us saying that we're not paying them" (Ex. B (F. Gangi Dep.) at 149-50) is contradicted by the evidence, including the lawsuit that Realty's former attorneys (Cole, Raywid) filed against Realty and other Global NAPs parties in November 2004 for Realty's failure to pay its legal bills, plus the prejudgment remedy that those attorneys were able to secure against Global Inc. in late 2004. Ex. H (12/14/04 Docket Order and Summons to Trustee). This factor, too, is satisfied.

g.     The transfer was of substantially all of Realty's assets.

At the time of the transfer, Realty had little assets. When asked at his deposition to identify the assets that Realty had as of the date of the conveyance in November 2005, Frank's response was that "I can't tell you with specificity." Ex. B (F. Gangi Dep.) at 80. When asked to identify the documents that would reflect Realty's assets, Frank referenced "invoices or cancelled checks" in relation to Realty's personal property—none of which were produced and,

according to defense counsel, no longer exist—and "deeds" in relation to Realty's real property—again none of which were produced. *Id.* at 81.[4]

Indeed, the evidence shows that Realty only owned three pieces of property at the end of 2004. However, in December 2004, Realty transferred a building in Massachusetts to a "shell" entity in exchange for the entity assuming a debt. Ex. T (1120 Hancock transfer); Ex. B (F. Gangi Dep.) at 84; Ex. E (12/1/08 F. Gangi Evid. Hearing) at 75. In April 2005, Realty transferred a building in Atlanta to another Ferrous Miner-owned entity, again in exchange for a reduction of debt. Ex. U (1003 Donnelly transfer); Ex. B (F. Gangi Dep.) at 89. Thus, in November 2005, when Realty conveyed the Las Vegas property to Sahara, it was transferring its last piece of real property. Ex. B (F. Gangi Dep.) at 84, 89. *See South Side*, 783 S.W.2d at 144 (finding debtors did not have property of any "monetary value" after transfer of all real estate). Gangi further speculated that Realty had anywhere between 0-100 "customers" in 2005, but, again, could not say for certain and did not produce any written records verifying the number of, or proceeds from, these customers. Ex. B (F. Gangi Dep.) at 84, 89. ████████████

████████████████████████████████████████████████████

████████████████████    In any event, these assets are far outweighed by Realty's liabilities, as set forth above.

> h.    The transfer occurred shortly before or after Realty incurred a substantial debt.

This factor is satisfied too. The transfer occurred in November 2005. Realty was the lessee on numerous multi-year leases at that time. In December 2004, the Cole, Raywid law firm obtained $250,000 in prejudgment relief against Global Inc. on its claim that the Global defendants had failed to pay over $2 million in legal bills. In April 2006, SNET obtained a

---

[4]   The supposed real property assets might not be assets at all. As Frank testified: the real estate "came with a liability.  I don't think Realty had any equity in them." Ex. B (F. Gangi Dep.) at 80.

prejudgment remedy of $5.25 million against Global NAPs, Inc. in the Connecticut case. Several other lawsuits were pending.

* * *

In sum, this case is rife with "badges" (at least 8 of the 11) that demonstrate actual fraudulent intent as a matter of law.  Coupled with the fact that the Connecticut court found that Realty and the other Global NAPs entities withheld and destroyed documents that undoubtedly would be germane to this case, SNET has amply met its obligations under Fed. R. Civ. P. 56.

2.      Defendants Failed To Meet Their Burden of Proof.

As set out above (at p. 16, *supra*), when the presumption of fraud arises, as it has here, the burden shifts to the defendant to "explain[] away" (*Denlinger*, 982 F.2d at 237) the badges of fraud.  It is manifest that they have utterly failed to do so.  Defendants have not produced a single document that reflects consideration being paid for the Las Vegas Property.  They have not explained away the facts that the transfer was from one Ferrous Miner-owned company to another, and that two brothers, one purportedly representing each party, agreed on the value of the property being transferred without having a single appraisal conducted.  They have not explained away the fact that several lawsuits were pending against Realty and the larger Global NAPs family at the time of the transfer of the property, or that Realty and the Global entitles had incurred liabilities around the time of the transfer.  They have not explained away the fact that Realty had little, if any, assets at the time of the transfer, or that Realty had transferred away its three pieces of real property over 11 months.  They have not established that Realty was solvent in November 2005.  Indeed, defendants' 30(b)(6) representative and owner of the entire Global NAPs empire repeatedly refused to provide virtually any information, testifying, for example, that he did not know Realty's revenues for 2005.  Ex. B (F. Gangi Dep.) at 81.  He did not know whether and when Realty had a bank account.  He did not know how many customers Realty had in 2005, or today.  *Id.* at 79.  However, he did testify—somewhat incredibly—that the property

was transferred for "liability" purposes—"Realty decided it no longer wanted to be an owner of the property, and I didn't want to have my property owned by Realty.  I wanted them to be separate entities.  I didn't want all my eggs in one basket."  *Id.* at 175; *see also id.* at 175-76 ("[Y]ou know, if somebody trips and falls in one facility, they can't sue them over another facility.").

The burden of proof was on defendants, and they failed to meet this burden.  Defendants' failure to provide information and documentation, coupled with the fact that the underlying judgment out of which this case arises was entered against Realty and the other Global NAPs defendants *for the very reason* that they destroyed documents and refused to provide the court with the requested information, compels summary judgment against them here.  As the Seventh Circuit has observed, "[n]either summary judgment nor directed verdict can be avoided by simply saying, "nevertheless, it is not so."  *Denlinger*, 982 F.2d at 237; *see also South Side*, 783 S.W.2d at 144 (relying, inter alia, on defendant's "failure to produce rebutting evidence when the circumstances surrounding the transfers are suspicious" in upholding determination of actual fraudulent intent).

**B.     The Conveyance of The Las Vegas Property Was Constructively Fraudulent.**

In the alternative, Realty's conveyance of the property to Sahara was constructively fraudulent.  Under Nevada law, even if there is no proof of actual intent to defraud—which there is here—a conveyance nonetheless can be set aside as fraudulent as a matter of law.

A transfer will be set aside if the debtor did not receive "reasonably equivalent value in exchange for the transfer" and the debtor (1) "was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due."  Nev. Rev. Stat. § 112.180(1)(b).

1

2

3      Here, there can be no dispute that SNET has established each of the required elements.

4  First, as discussed above (at pp. 22-23, *supra*), Realty did not receive reasonably equivalent

5  value in exchange for the transfer of the Las Vegas property.  Rather, Realty transferred the

6  property to an insider in exchange not for money but for the assumption of a debt previously held

7  by Realty, even though the insider has no income and no revenue and no way ever to repay the

8  debt that it assumed, and notwithstanding the fact that there are no written documents evidencing

9  this purported arrangement.  *See, e.g.*, *Murin v. Estate of Schwalen*, 31 A.D. 3d 1031, 1034-35

10  (N.Y. App. Div. 2006) ("While an antecedent debt may provide fair consideration for a

11  conveyance of real property, defendant's conclusory and undocumented allegations as to both

12  the existence of the debt and the circumstances under which it was incurred are insufficient to

13  raise a question of fact as to fair consideration.").  Moreover, Realty did not conduct an appraisal

14  or otherwise satisfy itself as to the value of the property it was transferring; instead, Richard and

15  Frank unilaterally determined to transfer the property and at what value.  Ex. B (F. Gangi Dep.)

16  at 181.

17      Second, as discussed above (at pp. 24-26, *supra*), at the time of the conveyance in

18  November 2005, Realty was engaged in business for which its remaining assets were

19  unreasonably small in relation to the business and/or intended to incur, or believed or reasonably

20  should have believed that it would incur, debts beyond its ability to pay as they became due.

21  Nev. Rev. Stat. § 112.180(1)(b).  Realty had little, if any remaining assets in November 2005. It

22  had transferred all of its real estate to other Frank Gangi-owned and -controlled entities.

23  Moreover, as set forth above, Realty's expenses and liabilities far outweighed any purported

24  revenues or assets.  It had been named as the defendant in several lawsuits, and at least one

25  judgment already had been entered against its alter ego, Global Inc.

26      For these reasons, the transfer was constructively fraudulent as a matter of law.

27  Summary judgment is proper on this basis too.

28

1
2
3    **IV.    CONCLUSION**

4         As the Seventh Circuit recently held, the "corporate structure that the Gangi brothers

5    have created appears to be designed to keep all its assets in corporations that have no liabilities

6    and all its liabilities in corporations that have no assets."  *Illinois Bell,* 551 F.3d at 597.  That

7    description is certainly apt here.  For this and all of the reasons set out above, SNET respectfully

8    request that the Court grant summary judgment in its favor.

9
                                          Respectfully submitted,
10
                                          THE SOUTHERN NEW ENGLAND
11                                        TELEPHONE COMPANY

12

13                                        By and through its attorneys,

14                                        /s Lauren R. Noll

15
                                          Roger Moffitt
16                                        AT&T Services, Inc.
                                          645 E. Plumb Lane, Room B132
17                                        Reno, Nevada 89502
                                          Telephone: (775) 333-3114
18
                                          Bettina Getz (admitted *pro hac vice*)
19                                        Lauren R. Noll (admitted *pro hac vice*)
                                          Anne M. DeGeest (admitted *pro hac vice*)
20                                        MAYER BROWN LLP
                                          71 South Wacker Drive
21                                        Chicago, Illinois  60606
                                          Telephone: (312) 782-0600
22                                        Facsimile: (312) 701-7711

23
24
25
26
27
28

1

<u>**CERTIFICATE OF SERVICE**</u>

2

3

    I, Anne M. De Geest, an attorney, hereby certify that a true and correct copy of the foregoing **Plaintiff's Motion for Summary Judgment** has been served, pursuant to Local Rule 5-4, upon:

4

5

                Deanna L. Forbush
                Burt Wuester Jr.

6

                Fox Rothschild, LLP
                3800 Howard Hughes Parkway, Suite 500
                Las Vegas, Nevada 89169

7

                bwuester@foxrothschild.com
                dforbush@foxrothschild.com

8

9

                Joseph M. Pastore III
                Paul R. Dehmel

10

                Fox Rothschild, LLP
                One Landmark Square, 21st Floor

11

                Stamford, CT 06901
                jpastore@foxrothschild.com

12

                pdehmel@foxrothshild.com

13

14

via ECF electronic filing on this 8th day of March, 2010.

15

                                      /s/ Anne M. De Geest

16

17

18

19

20

21

22

23

24

25

26

27

28