Roger Moffitt
AT&T Services, Inc.
645 E. Plumb Lane, Room B132
Reno, Nevada 89502
Telephone: (775) 333-3114
Bar No. 5723

Bettina Getz (*pro hac vice*)
Lauren R. Noll(*pro hac vice*)
Anne M. De Geest (*pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Attorneys for Plaintiff
THE SOUTHERN NEW ENGLAND
TELEPHONE COMPANY

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
## LAS VEGAS DIVISION

| | |
|---|---|
| THE SOUTHERN NEW ENGLAND TELEPHONE COMPANY,<br><br>    Plaintiff,<br><br>    v.<br><br>SAHARA AND ARDEN, INC., and GLOBAL NAPS REALTY, INC.,<br><br>    Defendants. | Case 2:09-cv-00534-RCJ-PAL |

**PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
(REDACTED)**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  REALTY'S CONVEYANCE OF THE LAS VEGAS PROPERTY WAS
ACTUALLY FRAUDULENT. ....................................................................... 3

   A.  SNET Has Established The Badges Of Fraud As A Matter Of Law. .................. 3

      1.  Sahara Is an Insider of Realty. .................................................. 3

      2.  Realty Retained Possession of the Property After the Transfer................ 6

      3.  SNET Sufficiently Established That Realty Had Been Sued or
Threatened  With Suit Before the Transfer............................................. 8

      4.  Defendants Do Not Address SNET's Argument That Defendants
Concealed the True Circumstances of the Conveyance............................ 9

      5.  There Was No Consideration.................................................... 10

      6.  Realty Was Insolvent or Became Insolvent Shortly After the
Transfer Was Made................................................................. 11

      7.  The Transfer Was of Substantially All of Realty's Assets ..................... 13

      8.  The Transfer Occurred Before and After Realty Incurred
Substantial Debts. ................................................................. 15

   B.  Defendants Failed to Meet Their Burden of Proof. ............................................. 16

III.  THE CONVEYANCE OF THE PROPERTY WAS CONSTRUCTIVELY
FRAUDULENT.............................................................................................. 19

CONCLUSION....................................................................................................... 20

i

## I.      INTRODUCTION

Defendants' response to plaintiff Southern New England Telephone Company's ("SNET") motion for summary judgment has many flaws.  Defendants do not cite a single case of their own but rather mischaracterize several of the cases that SNET cites in its opening brief ("Op. Br.").   Defendants argue that SNET has not authenticated its evidence, apparently overlooking parts of SNET's brief where SNET has done just that.  Defendants dispute that they were named parties in a case even though the Court can take judicial notice of such a fact. Defendants dispute the validity and meaning of SNET's evidence, but they fail to provide the Court with any contrary evidence whatsoever.  Indeed, in one instance, defendants challenge the validity of documents that their own counsel produced to SNET, even though those documents were accompanied with an explanatory letter from their counsel and are deemed to be admissions.

It is well established that a party, in order to avoid summary judgment, must come forward with specific facts showing that there is a genuine issue for trial.  It is clear from the face of defendants' brief that they have failed to do so.

Defendants also ignore many salient facts, even though they are crucial to a resolution of this case.  There is not a single mention of the following evidence:

1.      This case only exists because another federal court entered a $5.8 million judgment against Global NAPs Realty, Inc. ("Realty") and other Global NAPs entities after the court made the rather extraordinary finding that the defendants had destroyed documents and committed a fraud on SNET and the court, and thereafter issued a default judgment piercing the corporate veil of Realty, Ferrous Miner (the parent company of the defendants), and the other Global NAPs entities.  *SNET v. Global NAPS, Inc. et al.*, 251 F.R.D. 82, 93-96 (D. Conn. 2008).

2.    At around the same time that defendant Realty transferred the property at issue to co-defendant Sahara & Arden, Inc. ("Sahara"), Realty also transferred its only other two pieces of real property, also to other Frank Gangi-owned shell companies.

3.    In violation of his obligations under the Federal Rules, Defendants' 30(b)(6) witness, Frank Gangi, made no attempt to know anything about any of the topics identified in the notice of deposition, repeatedly stating that he "did not know." For example, he did not know on which entity's accounting records the property is reflected; Realty's revenues for 2005; whether and when Realty had a bank account; and the nature and identity of Realty's assets. Ex. B at 36, 79, 80, 81, 200.[1]

4.    Several federal courts have found the various Global NAPs entities, including Realty, to be alter egos of each other. Op. Br. at 5; *infra*, at 15-16. This is significant because entities that are alter egos are treated as one, so that any act committed by one is attributed to all, and if one alter ego is bound by a judgment, the others are also bound.

5.    Defendants omit from their statement of material facts that Sahara is wholly owned and controlled by Ferrous Miner and therefore Frank Gangi. Given that the transfer of the property from one Frank Gangi-owned company to another is a central aspect of this case, it is disingenuous for defendants to omit that fact and bury it in a lengthy brief.

In sum, the uncontroverted evidence establishes that Realty fraudulently transferred the property at issue to the detriment of creditors such as SNET. Defendants should not be permitted to prolong this case on the strength of unsubstantiated denials and mischaracterizations of fact and law.

---

[1] All references to lettered exhibits are to the exhibits included as part of SNET's Opening Brief. All references to numbered exhibits (1-5) are attached herein.

## II.  REALTY'S CONVEYANCE OF THE LAS VEGAS PROPERTY WAS ACTUALLY FRAUDULENT.

### A.  SNET Has Established The Badges Of Fraud As A Matter Of Law.

#### 1.  Sahara Is an Insider of Realty.

It is undisputed that the transfer of the Las Vegas property at issue was from one company wholly owned by Ferrous Miner to another company wholly owned by Ferrous Miner. It is also undisputed that Ferrous Miner is wholly owned by Frank Gangi. Thus, the conveyance was to an insider.

Defendants attempt to get around this inescapable conclusion by misreading the plain language of Nevada's Uniform Fraudulent Transfer Act ("Uniform Act" or "UFTA"). The statute defines affiliate, *inter alia*, as:

> (a) A person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities

> * * *

> (b) A corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote, by the debtor or a person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities.

> * * *

Nev. Rev. Stat. § 112.150(1)(a) & (b).  In defendants' view, the latter part of subsection (b)—a "person who directly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor"—is a stand-alone definition of when a person is an affiliate, rather than modifying the earlier part of the sentence and defining when a corporation is an affiliate.

As a matter of statutory construction, Nevada courts interpret statutes in a way that would not render words or phrases superfluous. *Mangarella v. Nevada*, 117 Nev. 130, 133 (2001)

3

("[T]here is a presumption that every word, phrase, and provision in the enactment has meaning."). And when interpreting state statutes, "a federal court applies the relevant state's rules of statutory construction." *Arandell Corp. v. XCEL Energy, Inc.*, 619 F.Supp.2d 1062, 1068 (D. Nev. 2008) (citing *In re Lieberman*, 245 F.3d 1090, 1092 (9th Cir. 2001)).

Here, defendants' reading of subsection (1)(b) of the Uniform Act renders subsection (1)(a) superfluous. As set out above, that subsection already defines an affiliate as "a person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities." There is no reason for (1)(b) to just repeat what (1)(a) has already said. In other words, subsection (1)(a) defines how a person may be an affiliate, whereas subsection (1)(b) defines only how a corporation may be an affiliate.

Thus, a corporation may be an affiliate under two situations: (1) when 20% of its stock is owned by the debtor or (2) when 20% of its stock is owned, directly or indirectly, by a person who also owns 20% of the debtor. See Op. Br. at 17. Frank Gangi indirectly owns both Realty and Sahara, because he wholly owns Ferrous Miner, which in turn wholly owns both Realty and Sahara. Op. Br. at 4. Indeed, as defendants told the State of Nevada in a filing, the "[p]roperty [is] being transferred between companies with identical ownership." Ex I. This element is thus satisfied as a matter of law. See *Scott Dugas Trucking & Excavating, Inc. v. Homeplace Building & Remodeling, Inc.,* 1994 Me. Super. LEXIS 175, *13 (Me. Super. Ct. 1994) (two corporations are "insiders" under the Uniform Act where the same individual owned at least 20% of each).

Defendants—without citing a single case of their own—also argue that SNET's case are inapposite, but each purported distinction is incorrect. For example, with regard to *In re National Audit Defense Network,* defendants tell the Court (at 7) that the "decision is not applicable here because the transfers at issue in that case appear to have gone directly from corporate entities to the individual shareholders who directly controlled the entities." To the contrary, the Trustee in

4

1

2

3  that case sought "to avoid $1,046,585 in transfers from NAND to Coolidge **and** the Coolidge

4  Defendants, and to avoid $3,718,192.39 in similar transfers to Rodrigues **and** the Rodrigues

5  Defendants." *In re Nat'l Audit Def. Network*, 367 B.R. 207, 212-13 (Bankr. D. Nev. 2007)

6  (emphasis added).   The "Coolidge Defendants" were various companies controlled by the

7  individual Coolidge, and the "Rodrigues Defendants" were various companies controlled by the

8  individual Rodrigues.   As the court makes clear, the Trustee is voiding transfers to both

9  individuals and the corporations they control.  *Id.* at 212.

10     Defendants also complain (at 7) that *Scott Dugas* and *Telephone Equipment Network, Inc.*

11  *v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601 (Tx. Ct. App. 2002), "relied upon state common law

12  (Maine and Texas) rather than the Fraudulent Transfer Act."   Again, that simply is incorrect.

13  Although the plaintiff in *Scott Dugas* advanced his claim on both common law and UFTA

14  grounds, "[p]ursuant to either the Act or the common law, the court concludes that the

15  transaction between A.B. Richards and Homeplace was fraudulent."   *Scott Dugas*, 1994 Me.

16  Super. LEXIS at *8; see also *id.* at *13 ("Homeplace was an 'insider' **within the meaning of the**

17  **Act** since Richards owned more than 20% of A.B. Richards' shares with voting rights.  See 14

18  M.R.S.A. 3572(1), (7)(D).") (emphasis added).  The court did not rely on the common law to

19  interpret what constitutes an "insider" under the UFTA; it relied on the statutory language itself.

20  Similarly in *Telephone Equipment*, even a casual reading of the case reveals that the court did

21  not rely on the common law: "First, the evidence suggests TEN was an 'insider.' *See* TEX. BUS.

22  & COM. CODE ANN. 24.005(b)(1)."  *Telephone Equip.*, 80 S.W.3d at 609 (relying on statute's

23  use of the word "includes" in its definition of "insider" to reach the transferee).  This section of

24  the Texas code cited by the court is Texas' uniform fraudulent transfer act.

25     Finally, defendants take issue (at 7) with *South Side National Bank v. Winfield Financial*

26  *Services Corporation*—a case that is almost wholly on all fours with this one—on the grounds

27  that the statute being construed there was "not a mirror image of the Nevada statute at issue in

28

5

this case."  That case was decided under the Uniform Fraudulent Conveyance Act ("UFCA"), which was the predecessor to the UFTA.  What defendants overlook is that courts, when analyzing fraudulent transfers under the UFTA, rely on cases construing the UFCA.  *E.g.*, *Dearborn Street Bldg. Assocs. LLC v. D & T Land Holdings, LLC*, 2009 WL 3011245 at *4 n.5 (W.D. Mich. 2009) (noting that the UFTA "did not fundamentally alter the nature of fraudulent transfers from the prior UFCA"); *In re Canyon Sys.,* 343 B.R. 615, 634 n.15 (Bankr. S.D. Ohio 2006) ("Similar policies underlie these two uniform acts; thus, the Court relies on case law interpreting both the UFCA and the UFTA."); *Sedwick v. Gwinn*, 873 P.2d 528, 531 (Wash. Ct. App. 1994) ("Cases decided under the UFCA are relevant when interpreting the UFTA because the acts' provisions are essentially the same.").  Thus, the holding of *South Side*—that transfers between two entities "controlled by the same person" where the individual was the "alter ego of the corporations and the corporations were a subterfuge" were actually fraudulent—is compelling here.  See also *Otero v. Vito*, 2009 WL 3063426 at *8 (M.D. Ga. 2009) ("[A]ll of the Vito Entities were insiders as to Dr. Vito, in that they were his alter egos.") (case decided under Georgia's UFTA).[2]

    2.  Realty Retained Possession of the Property After the Transfer.

   Regarding the badge of fraud related to the post-conveyance possession of the property, defendants miss the point of SNET's evidence.  As established in SNET's opening brief, Realty and the other Global NAPs entities—such as Global NAPs Inc.—are treated by defendants as interchangeable.  Op. Br. at 4-7.  Indeed, defendants title their response brief in this case as

---

[2] Later in their brief (at 21), defendants assert that "SNET has offered no evidence that the corporate formalities between Realty and Sahara were not respected such that the common ownership should be viewed as an indicia of fraud."  To the contrary, SNET's brief is replete with undisputed evidence that corporate formalities were not observed.  Op. Br. at 4-7, 10-11.  Indeed, Frank Gangi himself saw no need to observe corporate formalities between the two entities he owned and controlled, testifying, for example, that he did not perform an appraisal or title search on the property before the conveyance: "These are related parties that know one another" and "trust one another."  Ex. B. at 184.

1

2

3   "Opposition to Motion for Summary Judgment By Sahara and Arden, Inc. and *Global NAPs,*

4   *Inc.*"—instead of Realty.  Even more probative, several federal courts have found the various

5   Global organizations to be alter egos of one another, a relevant fact that defendants simply

6   ignore.  Op. Br. at 5; *infra* at 15-16.  It is undisputed that the Global entities did not maintain

7   separate financial records before 2006 and that they commingled assets and liabilities.  Ex. A at

8   35.  Thus, the fact that the property never once appears on a single document as belonging to

9   Sahara—the putative owner—is both unsurprising and telling.  The property remained on the

10  balance sheets of Global Inc. both before and after the transfer.  Exs. J, K.  The tax bills are

11  currently directed to the now-deceased Richard Gangi, who was the seller of the property (not

12  the buyer) and are paid by another Global entity on behalf of Global Inc.  Exs. M, N.

13          Defendants do not offer any evidence disputing the accuracy of these documents, as is

14  their burden on summary judgment; rather they tell the Court (at 8) without support that they

15  "dispute" the "validity" of documents produced by them, including documents that their counsel

16  produced after Frank Gangi's deposition and after additional inquiry by SNET—documents that

17  were accompanied by a letter from counsel explaining the very meaning of the documents.  *See*

18  Ex. 1 at 3 (attached); Exs. M, N.[3]  Not only is such a tactic disingenuous, but it is insufficient

19  under the Federal Rules, which requires more than mere denials or objections to successfully

20  oppose a motion for summary judgment.  Fed. R. Civ. P. 56(e)(2); see also *Berg v. Kincheloe*,

21  794 F.2d 457, 459 (9th Cir. 1986) ("The party opposing summary judgment may not rest on

22  conclusory allegations, but must set forth specific facts showing that there is a genuine issue for

23  trial.").  In sum, among the "[m]ost compelling" badges of fraud is where a defendant "continued

24  to use the property as if he owned it" after transferring it, including continuing to pay taxes on

25  ─────────────

26  [3] The letter from defendants' counsel qualifies as a party admission.  *See Totten v. Merkle*, 137 F.3d
    1172, 1176 (9th Cir. 1998) ("Under the federal rules, a statement made by an attorney is generally
    admissible against the client.").

27

28

7

the property." *Davis v. Davis,* 1996 Mich. App. Lexis 1268 at *7 (Mich. Ct. App. 1996); see also Op. Br. at 19-20.

> 3.     SNET Sufficiently Established That Realty Had Been Sued or Threatened With Suit Before the Transfer.

Here, defendants refuse to admit to the Court (at 9) that Realty was a named defendant in the *Cole, Raywid* case as of the time of the property transfer in November 2005.  They also refuse to admit that they were named as defendants or counter-defendants in other cases cited by SNET in its brief, or the date on which they became parties.  It is incredulous that defendants do not admit facts of which this Court clearly can take judicial notice.  *E.g.*, *Banks v. Clark County*, 2010 U.S. Dist. LEXIS 32671 (D. Nev. April 2, 2010) ("Under Federal Rule of Evidence 201, a court may take judicial notice of matters of public record.") (quotes and citation omitted) (Jones, J.); *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (taking judicial notice of plaintiff's five prior cases); *Hussein v. Ersek*, 2009 WL 633791, *1 (D. Nev. March 6, 2009) ("Materials from another court's proceeding are appropriate for judicial notice."); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172-73 (10th Cir. 1979) ("[I]t has been held that federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue" and noticing federal and state cases to which the parties had been party); *Musilli v. Droomers*, 398 B.R. 447, 453 (E.D. Mich. 2008) (same).  It is further incredulous that Realty would deny, as it did, that it "had been sued or threatened with suit at the time of the conveyance." Ex. C at. 13.

In addition, defendants entirely ignore (and therefore must not dispute) the fact that other Global entities—their alter egos—had been named in at least six cases or administrative proceedings as of November 15, 2005 (see Op. Br. at 8-9).  The effect of "applying the alter ego doctrine is that the corporation and the individual who dominates it are treated as one, 'so that any act committed by one is attributed to both, and if either is bound, by contract, judgment, or

otherwise, both are equally bound.'" *Brown v. Kinross Gold U.S.A., Inc.*, 531 F.Supp.2d 1234, 1241 (D. Nev. 2008). Moreover, a lawsuit is relevant for purposes of the Uniform Act regardless of whether it is brought against the debtor or a company closely connected with the debtor. Op. Br. at 20; see also *In re Prosser*, 2009 WL 3270756, at *10-11 (Bankr. D.V.I. 2009) (finding fraud where litigation was pending against debtor's predecessor corporation as well as its parent, although debtor itself as not a defendant to those suits at the time of the challenged transfer). Thus, whether named directly or via an alter ego, Realty was a defendant in several lawsuits in November 2005.

Defendants also do not address or provide evidence disputing Frank's email to the CFO of the Global NAPs entities in May 2006 that "we are involved in many court battles." Ex. S. Thus, despite defendants' machinations, it is clear as a matter of law that Realty and its alter egos had been sued before the transfer of the property.

4.     Defendants Do Not Address SNET's Argument That Defendants Concealed the True Circumstances of the Conveyance.

As is becoming a pattern, defendants do not bother to address SNET's argument, supported by evidence and case law, that defendants concealed the true circumstances of the conveyance. Rather, they state—incorrectly—that "SNET made no effort to try to satisfy this consideration" because the quitclaim deed was properly filed. Resp. at 8-9, 22. That is not the point. SNET agrees that a quitclaim deed was filed with the State of Nevada. What is relevant for purposes of this badge, and what defendants fail to address, is that the formal documentation does not reflect the actual circumstances surrounding the transfer. The deed reflects only a value of $240,000 for the property, and it is undisputed that the purported consideration for the property was not a simple transfer of cash. The deed makes no mention of a loan that is purportedly being transferred from one insider to another and, therefore, does not contain "sufficient information that would put creditors on notice of the fraudulent nature of the

transaction." *In re Prosser*, 2009 WL at 3270765, at *8-9 (holding that transfer was concealed, even where the defendant had recorded the deed evidencing the conveyance; defendants' audited financial statements were "misleading," delayed, and "inaccurately described the transfer" and the promissory note signed by the insider transferee was not available to the public).

     5.     There Was No Consideration.

Defendants respond (at 12-13) that Sahara had to have assumed Realty's debt in connection with the conveyance, because Realty had to have accepted a loan from Frank in order to purchase the property in the first instance.  This reasoning is not only circular but fails to provide one shred of evidence that Realty in fact received consideration for the conveyance.  Rather, it simply demonstrates that this conveyance, like Realty's two others that occurred right around the same time and in the same manner, was fraudulent.

The law is clear that satisfaction of an antecedent debt can constitute fair consideration, *but only if the antecedent debt is valid and existing.  E.g.*, *Pat Clark Sports*, 487 F. Supp.2d at 1179; see also Nev. Rev. Stat. § 112.170.  In other words, proper documentation of the debt is necessary.  *E.g.*, *In re Nat'l Audit Def.*, 367 B.R. at 225-26; see also Op. Br. at 22.  Defendants utterly ignore this requirement and state, without referencing a single shred of evidence, that an "agreement to assume an obligation can constitute consideration" and "that is exactly what transpired in this instance."  Resp. at 20.  A one-sentence generalization, bereft of any support whatsoever, is not an adequate manner in which to avoid summary judgment.

Nor is it adequate to ignore the plethora of evidence establishing that there was no consideration.  In addition to the lack of even a single document reflecting the purported consideration, there are no loan agreements between the parties, or promissory notes.  Ex. B at 191-92.  Sahara has not behaved in a manner consistent with a party taking on a loan—for example, it has not recorded an interest expense in connection with the conveyance.  *Id.*  Frank's bald assertion that he "just knows that there is" consideration simply is not enough—particularly

where the conveyance occurred at a time when debts and obligations were mounting and at a time where Frank decided to transfer Realty's two other pieces of real property using the same undocumented procedures.

        6.      Realty Was Insolvent or Became Insolvent Shortly After the Transfer Was Made.

Defendants' response is replete with mischaracterizations.

- Defendants tell the Court (at 15) that "SNET has offered no evidence from the outside accountants authenticating" Realty's December 30, 2006 adjusted trial balance (which is Ex K).  That is simply false.  In its brief, SNET laid out at length testimony from Realty's long-time accountant who prepared the trial balance, as well as the accountant's employee who was responsible for inputting the data (and she testified that she received that data directly from the Global entities).  SNET also attached excerpts from both of these individual's depositions.  See Op. Br. at 11, n1; Exs. Q, R.

- Defendants also assert (at 15) that Frank Gangi is not familiar with the adjusted trial balance.  When asked about the very same document in another case, Realty's only other officer and director, Michael Couture, testified it was "mostly Richard [Gangi, Frank's now-deceased brother] and Frank who dealt with" financial documentation relating to the Global NAPs companies such as the "Adjusted Trial Balance Reports."  Ex. 2 (2/24/10 Couture Dep.) at 58-59.

- Relatedly, defendants argue that the data in the 2006 adjusted trial balance is irrelevant because it post-dates the November 2005 conveyance. In addition to the fact that the document is relevant because it contains data relating to the period right around the conveyance, it is undisputed that Realty did not maintain separate balance sheets for 2005; all of the Global NAPs entities, of which Realty is a part, improperly commingled

assets and liabilities before that date.  Ex. A at 35.  SNET can only rely on the documents that exist and were produced.

- Defendants also argue (at 16) that the liabilities set forth in the adjusted trial balance are "a long-term liability" and, for some unexplained reason, not probative here. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

- Defendants assert (at 14) that Ferrous Miner's 2005 tax return is irrelevant. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████

- Defendants apparently dispute that between 1998 and 2007, Realty entered into numerous multi-year leases, incurring large liabilities to lease property used by the Global NAPs enterprise.  The leases that defendants produced in the underlying Connecticut litigation (documents that defendants did not identify to SNET in this case until February 9, 2010, well after Frank Gangi was deposed and well after the discovery cut-off (Ex. 1 at 3)) establish that in 2005 alone, Realty was contractually obligated to pay tens of thousands of dollars a year in rental payments.  In a later deposition, Frank similarly testified that in 2005, Realty had rental payments of, at a minimum, "between 100 [thousand] and $200,000 . . .  a month."  Ex. 3 (2/25/10 F. Gangi Dep.) at 233.

- SNET does not reference the leases because it thinks that 'Realty was insolvent merely because it was a lessee."  Resp. at 15.  The evidence is relevant because it shows that

Realty had large liabilities around the time of the conveyance, a fact also confirmed by the trial balance sheets.

- Finally, Realty does not attempt to controvert several crucial pieces of evidence that all establish that Realty was insolvent around the time of the conveyance.  First, Realty does not dispute—indeed, it mentions nowhere in its brief—that the district court in the Connecticut action expressly found that the Global NAPs entities, including Realty, had destroyed financial data documents undoubtedly relevant here.  ██████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████ They do not even attempt to bolster Frank's (incorrect) testimony that he knows Realty is profitable because of the "lack of people suing us saying that we're not paying them," and they do not mention the lawsuit that Realty's former attorneys filed against Realty and other Global NAPs parties in November 2004 for Realty's failure to pay its legal bills, plus the prejudgment remedy that those attorneys were able to secure in late 2004.  Ex. H.

In sum, it is clear as a matter of law that Realty was insolvent around the time of the transaction.  Realty's response—misstating and misconstruing the evidence it wants to address, and ignoring the evidence that it does not—is insufficient to avoid summary judgment.

    7.   The Transfer Was of Substantially All of Realty's Assets

Defendants failed to provide any evidence that the conveyance was not of substantially all of Realty's assets. To the contrary, their 30(b)(6) witness could not identify the assets that Realty had as of the date of the conveyance in 2005, despite the fact that one of the enumerated topics on the notice of deposition to Realty was the "nature and identity of your assets, employees, directors, owners, and corporate structure."  Ex. 4 (amended notice of deposition).

Defendants similarly do not mention, as SNET pointed out in its opening brief, that Realty only owned three pieces of property at the end of 2004 and that it transferred *each and every one* of them to corporate shells owned by Frank in exchange for the corporate shell taking on an undocumented debt.  In December 2004, Realty transferred a building in Massachusetts to a "shell" entity in exchange for the entity assuming a debt. Ex.. T; Ex. B at 84; Ex. E at 75.  In April 2005, Realty transferred a building in Atlanta to another Ferrous Miner entity, again in exchange for a reduction of debt.  Ex U; Ex. B. at 89.  █████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

Thus, in November 2005, when Realty conveyed the Las Vegas property to Sahara, it was transferring its last piece of real property.  Ex. B at 84, 89.  Clearly that fact is relevant—if not dispositive—on this point.[4]

Finally, defendants again quibble with Realty's 2006 trial balance report, telling the Court a second time (at 10) that it was not authenticated—even though it clearly was.  See, *supra*, at 11.  Moreover, defendants did not introduce any evidence[5] establishing what Realty's

---

[4] Defendants make the curious statement (at 10) that "Realty did not own the Property outright" and that the "value of the Property as an asset of Realty is very much in doubt."  In addition to the fact that defendants later state that "Realty was the purchaser," raising the question of why they spend the first parts of their brief seemingly disputing the point, it does not address SNET's evidence that the Global entities are treated as interchangeable and that it is unclear from the documentation as to what entity actually acquired the property in 2000 in the first instance: Ferrous Miner, Realty, or Global Inc. Defendants filed papers with the State of Nevada indicating that Realty was the purchaser, so it is difficult to see why they would insinuate here that that representation was false.

[5] Defendants state (at 21) that "Realty continued to be the lessee of numerous properties around the country."  Realty's obligations to pay rent to landlords cannot, under any definition, be considered an asset.  Defendants also state that Realty had customers of its own and that those "payments to Realty were sufficient to satisfy its obligations."  *Id.* However, Realty's corporate representative (Frank) could neither specify how many customers Realty served nor point to any documents identifying these customers.  Ex.
(cont'd)

assets were during the relevant time period, so they cannot dispute the fact that even if the

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ This

factor, too, is satisfied.

        8.     The Transfer Occurred Before and After Realty Incurred Substantial
            Debts.

      Defendants' response overlooks the fact that three district courts have found that the

Global entities, including Realty, are alter egos of each other.  In the Connecticut Action, the

district court, as part of its default judgment, held that the various Global NAPs defendants—

Realty, Global NAPs Networks, Inc., Global NAPs New Hampshire, Inc., and Ferrous Miner—

were alter egos of Global Inc.  *SNET v. Global NAPs, Inc. et al.*, 251 F.R.D. 82, 96 (D. Conn.

2008).  Based on that holding, the Northern District of Georgia held last year that "GN New

Hampshire and Ferrous Miner are collaterally estopped from challenging that they are alter egos

of GNAPs" and held that those defendants were alter egos of Global Inc.  Ct. Doc No. 38, *SNET*

*v. 1003 Donnelly Ave., Inc. et al.*, Case No. 08 CV 03816 (N.D. Ga. Sept. 2, 2009).   Just last

month, after SNET's opening brief in this matter was filed, the Southern District of Ohio granted

partial summary judgment for plaintiff The Ohio Bell Telephone Company, Inc., holding that it

was entitled to pierce the corporate veil of a Global NAPs entity (in that case, Global NAPs

Ohio, Inc.) to reach Ferrous Miner, because the plaintiff had been "misled by Global Ohio's

appearance as a legitimate corporation," and referring to Frank Gangi's testimony that he had set

up hundreds of "file" companies.  *The Ohio Telephone Co., Inc. v. Global NAPs Ohio, Inc.*, 2010

---

B at 36 (guessing that Realty had "between zero and a hundred customers" in 2005 and having "no idea"
how many customers Realty has today).   Again, the nature of Realty's assets was a specifically
enumerated topic in SNET's notice of deposition to Realty.   Ex. 4. ████████████████████████

████████████████████████████████████████████████████████████████████████
███████████████████████████

WL 987053 at *8 (S.D. Ohio Mar. 15, 2010).  The Seventh Circuit Court of Appeals, in another case involving the Global NAPs entities, similarly observed that the Global NAPs corporate structure "appears to be designed to keep all its assets in corporations that have no liabilities and all its liabilities in corporations that have no assets."  *Illinois Bell Tel. Co. v. Global NAPs Illinois, Inc.,* 551 F.3d 587, 597 (7th Cir. 2008).

The import of these holdings is that a judgment against one Global NAPs entity is a judgment against its alter egos. *Brown,* 531 F. Supp.2d at 1241.  Thus, the fact that the Cole, Raywid law firm obtained $250,000 in prejudgment relief against Global Inc. on its claim that the Global defendants, including Realty, had failed to pay over $2 million in legal bills is dispositive with regard to Realty.  So, too, the April 2006 $5.2 million prejudgment remedy that SNET obtained against Global NAPs in the Connecticut case.  As set out above and in SNET's opening brief, Realty also was liable on leases totaling two hundred thousand dollars a month. This factor is amply satisfied.

B.    Defendants Failed to Meet Their Burden of Proof.

Defendants argue (at 17) that they do not have the burden of proof to rebut the badges of fraud that SNET has established, but once again they do not cite a single case of their own. Rather, they attempt to distinguish some of SNET's cases in ways that simply are incorrect, and ignore the others.  They also overlook their obligations under Rule 56 to offer evidence establishing a material issue of genuine fact, which they manifestly have not done here.

First, defendants claim (at 18) that the Seventh Circuit's decision in *United States v. Denlinger*, 982 F.2d 233 (7th Cir. 1992), is "unavailing" because it "involved the application of Indiana common law."  Once again, defendants are plain wrong.  The *Denlinger* court applied Indiana's Uniform Fraudulent Conveyance Act to the conveyance at issue:

> Under Indiana law, this interest can be defeated if the property was conveyed "with the intent to hinder, delay or defraud creditors or other persons of their lawful ... debts," in which case, the

conveyance "shall be void as to the persons sought to be defrauded." Ind.Code Ann. § 32-2-1-14 . . . Proof of fraudulent intent need not be made by direct evidence under Indiana law. Indiana courts have regarded certain actions as badges of fraud and the concurrence of several of them as a critical circumstance. One badge of fraud is the transfer of property when a suit is pending or expected. Another is a transfer which renders the debtor insolvent or greatly diminishes his estate. So, too, is a transfer where the transferor retains the benefit and control of the property, as well as a transfer for little or no consideration. The concurrence of such badges is said to "create ... an overwhelming presumption of fraud" or to "raise ... a strong inference of fraudulent intent."

*Id.* at 236 (citations omitted).  Thus, *Denlinger*'s admonition that the "circumstantial evidence point[ing] to fraudulent intent . . . has to be explained away" applies with force here.  Defendants cannot avoid summary judgment "by simply saying, 'nevertheless, it is not so.'"  *Id.* at 237.

Also contrary to defendants' characterization (at 19), *United States v. Mantarro*, 1992 WL 551483 (N.D. Ohio June 19, 1992), is not "ambiguous at best" that burden shifting applies to actual fraud.  In *Mantarro*, the court considered plaintiff's actual fraud claim and noted that the "defendant did not meet his burden of showing no *actual intent* to defraud the United States."  *Id.* at *4.  In the next sentence, the court explained why defendant had not met this burden:  "Where, as in the instant case, the presumption of fraud arises, the burden shifts to the defendant to explain away the badges of fraud."  *Id.*  Although Realty is correct that the court later stated that "defendant 'did not meet his burden of showing no constructive intent,'" this statement comes seven paragraphs later, as part of the court's separate constructive fraud discussion.  *Id*. at *5.  Clearly, *Mantarro* applied burden shifting to an actual fraud case.

So did *In re Prosser*, 2009 WL 3270765 (Bankr. D.V.I. 2009), a case cited by SNET but defendants ignore.  There, the plaintiff established several badges that, taken together, suggested actual fraud.  The court held that "the existence of badges of fraud creates a prima facie case and raise a rebuttable presumption that the transaction is void. . . . Where the defendants have not established sufficient facts to rebut the presumption of a fraudulent transfer, summary judgment

is appropriate." *Id.* at *13.  Other courts are in agreement  *E.g.*, *Stoecklin v. U.S. Stoecklin*, 1995 WL 835648, at *5 (M.D. Fla Nov. 17, 1995) (holding, in fraudulent transfer case asserting actual fraud, that "[t]o avoid summary judgment the debtor must offer an innocent explanation for any of the asserted badges of fraud").

The Nevada cases are not inconsistent.  In *Pat Clark Sports, Inc. v. Champion Trailers, Inc.*, 487 F. Supp. 2d 1172, the district court references the badges applicable only to actual fraud cases in holding that if the "creditor produces evidence of "certain indicia or badges of fraud, the burden shifts to the defendant to come forward with rebuttal evidence that a transfer was not made to defraud the creditor." *Id.* at 1178.  As support, the court cited *Sportsco Enterprises v. Morris*, 112 Nev. 625, 917 P.2d 934, 938 (1996).  In that case, the Nevada Supreme Court, in its burden shifting discussion, also utilized the "badges of fraud" language applicable only to an actual fraud analysis and relied on cases where burden shifting was applied to actual fraud claims.  *See Erjavec v. Herrick*, 827 P.2d 615, 617 (Colo. Ct. App. 1992) (action brought under Colorado's actual fraud statute, C.R.S. 38-10-117); *Territorial Savings & Loan Assoc. v. Baird*, 781 P.2d 452, 462 n.18 (Utah Ct. App. 1989) (discussing burden shifting as part of its actual fraud analysis).

In any event, the Federal Rules of Civil Procedure generally require defendants to come forward with competent evidence that the transfer was not fraudulent in order to avoid summary judgment.  As the U.S. Supreme Court has explained, "[w]hen the moving party has carried its burden under Rule 56(c), *** the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quotations and citation omitted); *see also Brown*, 531 F.Supp.2d at 1240 ("The burden then shifts to the non-moving party to go beyond the pleadings and set forth specific facts demonstrating there is a genuine issue for trial.") (citing *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001)).

Thus, the burden shifted to defendants to explain away the badges of fraud, and they have failed to do so.  They have not—through their document production, testimony of their 30(b)(6) witness, or response brief—provided a single credible explanation for their decision to transfer a property from one  insider to another, at a time when they were transferring all of their other real property to insiders, at a time when they were insolvent, and at a time when debts and obligations were mounting.  Indeed, Realty's only other officer/director besides Frank *admitted* in another case that the conveyance of the Atlanta property was done precisely to avoid creditors.  Ex. 5.  There is no reason to waste judicial resources on a trial.  Summary judgment is warranted.

## III.   THE CONVEYANCE OF THE PROPERTY WAS CONSTRUCTIVELY FRAUDULENT.

Realty's conveyance of the Las Vegas property to Sahara also was constructively fraudulent.  Realty did not receive reasonably equivalent value for the property, and at the time of the transfer, Realty had little, if any, remaining assets and mounting debts.  Op. Br. at 28-29.

In response, defendants apply the totally wrong analysis.  They go through the badges of fraud that the Nevada statute enumerates in connection with actual fraud, not constructive fraud.  See Nev. Rev. Stat. § 112.180(a)-(k).  Indeed, constructive fraud is just that—constructive—for the very reason that it does not require proof of actual intent via the badges of fraud.  *E.g., Lewis v. Harlin*, 321 B.R. 836, 844 (E.D. Mich. 2005) (holding that bankruptcy court erroneously construed Michigan's UFTA "because the 'badges of fraud' apply only when considering a claim of actual fraud . . . , not constructive fraud"); *In re Baker*, 273 B.R. 892, 896 (Bankr. D. Wyo. 2002) ("A debtor's actual intent is irrelevant to a constructive fraud claim.").[6]

---

[6] In *Sportsco*, it appears that the Nevada court analyzed the badges of fraud as part of its constructive fraud analysis.  917 P.2d at 937-38.  However, the case that the *Sportsco* court cited in support was an actual fraud case, not constructive fraud.  See *Montana Nat'l Bank v. Michels*, 631 P.2d 1260, 1262-63 (Mont. 1981) (analyzing transfer under actual fraud portion of Montana's fraudulent conveyance statute, MCA 31-2-314, and holding that conveyance "was made with actual intent *** to hinder, defraud and delay plaintiff").  Other Nevada cases properly analyze constructive fraud in accordance with the Uniform Act —i.e., by focusing on the two elements of constructive fraud: inadequate consideration and insolvency of the debtor.  *E.g., Matusik v. A.O. Large*, 452 P.2d 457, 458 (Nev.  1969).

1
2
3        The remainder of defendants' arguments suffers from the same flaws as their analysis
4  under the actual fraud portion of the statute and is treated in Part II, *supra*.
5                                    **CONCLUSION**
6
7        For the reasons set out above and in SNET's opening brief, SNET respectfully requests
8  that the Court grant summary judgment in its favor.
9
                                    Respectfully submitted,
10
                                    THE SOUTHERN NEW ENGLAND
11                                  TELEPHONE COMPANY
12                                  By and through its attorneys,
13                                  /s Lauren R. Noll
14
                                    Roger Moffitt
15                                  AT&T Services, Inc.
                                    645 E. Plumb Lane, Room B132
16                                  Reno, Nevada 89502
                                    Telephone: (775) 333-3114
17
                                    Bettina Getz (admitted *pro hac vice*)
18                                  Lauren R. Noll (admitted *pro hac vice*)
                                    Anne M. DeGeest (admitted *pro hac vice*)
19                                  MAYER BROWN LLP
                                    71 South Wacker Drive
20                                  Chicago, Illinois  60606
                                    Telephone: (312) 782-0600
21                                  Facsimile: (312) 701-7711
22
23
24
25
26
27
28

## **CERTIFICATE OF SERVICE**

I, Anne M. De Geest, an attorney, hereby certify that a true and correct copy of the foregoing **Plaintiff's Reply Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment** has been served, pursuant to Local Rule 5-4, upon:

Deanna L. Forbush
Burt Wuester Jr.
Fox Rothschild, LLP
3800 Howard Hughes Parkway, Suite 500
Las Vegas, Nevada 89169
bwuester@foxrothschild.com
dforbush@foxrothschild.com

Joseph M. Pastore III
Paul R. Dehmel
Fox Rothschild, LLP
One Landmark Square, 21st Floor
Stamford, CT 06901
jpastore@foxrothschild.com
pdehmel@foxrothshild.com

via ECF electronic filing and UPS overnight delivery on this 19th day of April, 2010.

/s/ Anne M. De Geest