1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8   THE SOUTHERN NEW ENGLAND                    )
    TELEPHONE CO.,                              )
9                                               )
                    Plaintiff,                  )
10                                              )        2:09-cv-00534-RCJ-PAL
                                                )
        vs.                                     )
11                                              )
    SAHARA & ARDEN, INC. et al.,                )              **ORDER**
12                                              )
                    Defendants.                 )
13  _____         )

14          This case arises out of a money judgment in favor of Plaintiff in the U.S. District Court for

15  the District of Connecticut and the allegedly fraudulent transfer of a piece of real property between

16  Defendants in Nevada.  Before the Court is Plaintiff's Motion for Summary Judgment (#46, #47).[1]

17  For the reasons given herein, the Court grants the motion.

18  **I.      FACTS AND PROCEDURAL HISTORY**

19          In 2004, Plaintiff The Southern New England Telephone Company ("SNET") sued Global

20  NAPs, Inc. in the U.S. District Court for the District of Connecticut (the "district court") over unpaid

21  charges for services pursuant to SNET's federal tariff. (Compl. ¶ 12); *see The S. New England Tel.*

22  *Co. v. Global NAPs, Inc.*, No. 3:04-cv-2075-JCH (D. Conn.) (Hall, J.).  In May 2006, the district

23  court granted SNET a prejudgment remedy of $5.25 million. (Compl. ¶ 13).  Richard Gangi testified

24  _____

25          [1]Plaintiff presents the motion in both redacted and unredacted form.

1   that Global NAPs did not have the assets to satisfy the remedy and that he owned several other

2   companies that shared assets and functioned for a common purpose. (*Id.* ¶ 14).  SNET therefore

3   amended its complaint to add Global NAPs Realty ("Realty"), Global NAPs Networks ("Networks"),

4   Global NAPs New Hampshire ("New Hampshire"), and Ferrous Miner as defendants, alleging that

5   these entities were all alter egos of Global NAPs. (*Id.* ¶ 15).  The district court eventually sanctioned

6   Global NAPs under Rule 37 for failing to comply with the Court's discovery orders to turn over

7   financial documents to Plaintiff. (*Id.* ¶ 16).  Later, the district court entered partial summary judgment

8   in favor of Plaintiff for $5,247,781.45 in unpaid charges (*Id.* ¶ 17).  After finding Global NAP in

9   contempt for violating the prejudgment remedy orders, the district court ordered Global NAP to pay

10  $645,761.41 in costs and fees. (*Id.* ¶ 18).  The district court later found that all defendants had

11  willfully violated the court's discovery orders, and it entered a default judgment against all defendants

12  as a sanction, including on Plaintiff's claim that Realty, Networks, New Hampshire, and Ferrous

13  Miner are alter egos of one another liable for the debts of Global NAPs. (*Id.* ¶ 19).[2]  The district court

14  entered final judgment against all defendants on July 9, 2008 and on October 17, 2008 granted

15  Plaintiff's motion to register the judgment in other states. (*Id.* ¶¶ 20, 22).  The judgment remains

16  almost entirely unsatisfied. (*Id.* ¶ 23).

17          Plaintiff sued Sahara and Arden, Inc. ("Sahara") and Realty in this Court on a single cause of

18  action for Fraudulent Transfer and has now moved for summary judgment. Plaintiff seeks to set aside

19  a conveyance from Realty to Sahara of a piece of real property (the "Property") located at the

20  intersection of Sahara Ave. and Arden St. in Las Vegas, Nevada.  Plaintiff alleges that Sahara is

21  wholly owned by Frank Gangi, the same person who owns every defendant company involved in the

22  Connecticut litigation, which companies have already been ruled to be alter egos of one another. (*Id.*

23

24          [2]It is important in the present case that the issue of alter ego is precluded from relitigation
    with respect to these entities.

25                                          Page 2 of 20

¶ 3). Plaintiff alleges that Sahara and Realty are owned and controlled by the same person or persons; that Sahara has no assets or means of income and exists only as a shell to hide the assets of the alter ego judgment debtors, including Realty; that Realty transferred the Property to Sahara for no consideration; that Realty was insolvent, or nearly so, when it transferred the Property; that Realty was subject to several lawsuits, including the Connecticut litigation, when it transferred the Property; and that there are many more "badges of fraud," as identified in the case law, surrounding the transfer. Plaintiff requests that the court set aside the transfer as actually and/or constructively fraudulent and issue a writ of execution so that Plaintiff may execute upon the Property to partially satisfy Defendant's judgment debt to Plaintiff from the Connecticut litigation.

## II.    SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with

1   evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In

2   such a case, the moving party has the initial burden of establishing the absence of a genuine issue of

3   fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213

4   F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the

5   burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by

6   presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

7   demonstrating that the nonmoving party failed to make a showing sufficient to establish an element

8   essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*

9   *Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment

10   must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H.*

11   *Kress & Co.*, 398 U.S. 144, 159–60 (1970).

12        If the moving party satisfies its initial burden, the burden then shifts to the opposing party to

13   establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

14   *Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party

15   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed

16   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

17   truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir.

18   1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on

19   conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045

20   (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the

21   pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for

22   trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

23        At summary judgment, a court's function is not to weigh the evidence and determine the truth

24   but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The

25                                    Page 4 of 20

1   evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his

2   favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not

3   significantly probative, summary judgment may be granted. *See id.* at 249–50.

4   **III.   ANALYSIS**

5          Under Nevada law, a transfer by a debtor "is fraudulent as to a creditor, whether the creditor's

6   claim arose before or after the transfer was made," if the debtor made the transfer "with actual intent

7   to hinder, delay or defraud any creditor of the debtor." Nev. Rev. Stat. § 112.180(1)(a) (Nevada

8   Uniform Fraudulent Transfer Act, or "Uniform Act").[3]  Thus, where actual intent to defraud creditors

9   is proven, the conveyance will be set aside regardless of the adequacy of consideration exchanged.

10  Moreover, even where no actual fraud exists, a court will overturn a conveyance if there has been

11  "constructive fraud," which occurs when the debtor did not receive "reasonably equivalent value in

12  exchange for the transfer," and the debtor "(1) was engaged or was about to engage in a business or

13  transaction for which the remaining assets of the debtor were unreasonably small in relation to the

14  business or transaction; or (2) intended to incur, or believed or reasonably should have believed that

15  he would incur, debts beyond his ability to pay as they became due." Nev. Rev. Stat. § 112.180(1)(b).

16  ///

17  ///

18

19

20          [3]Nevada's version of the Uniform Act does not differ in any material respects from the
21  standard Uniform Act.  Forty-three states and the District of Columbia have enacted versions of
    the Uniform Act.  Cases from other jurisdictions interpreting uniform acts are deemed persuasive
22  by Nevada courts. *See Waldman v. Maini*, 195 P.3d 850, 860 (Nev. 2008) (applying Uniform
    Simultaneous Death Act) ("Because the Act is a uniform act applied in many states, the
23  jurisprudence of sister jurisdictions applying the Uniform Act is highly persuasive."); *see also
    Sportsco Enters. v. Morris*, 917 P.2d 934, 938 (Nev. 1996) (citing opinions from California,
24  Colorado, and Montana state courts).

25                                          Page 5 of 20

**A.     Actual Fraud**

**1.     Badges of Fraud**

Realty's conveyance of the Property—with no documentation reflecting the purported consideration and done at a time when lawsuits against Realty and the other Global NAPs companies were mounting—is actually fraudulent. "Traditionally, the intent required for actual fraudulent transfers is established by circumstantial evidence, since it will be the rare case in which the debtor testifies under oath that he or she intended to defraud creditors." *In re Nat'l Audit Defense Network*, 367 B.R. 207, 219–20 (Bankr. D. Nev. 2007). In this regard, courts have developed "badges of fraud"—that is, circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent. *Id.* at 220. The Nevada Uniform Act identifies eleven non-exhaustive badges of fraud as follows:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

1

2

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

3   Nev. Rev. Stat. § 112.180(2)(a)–(k). Although the "presence of a single factor, i.e. a badge of fraud,

4   may cast suspicion on the transferor's intent, the confluence of several in one transaction generally

5   provides conclusive evidence of an actual intent to defraud." *Gilchinsky v. Nat'l Westminster Bank*,

6   732 A.2d 482, 490 (N.J. 1999); *see also In re Nat'l Audit Def.*, 367 B.R. at 220 ("Although none of

7   the badges standing alone will establish fraud, the existence of several of them will raise a

8   presumption of fraud." (internal quotation marks and citation omitted)).

9          Once the creditor produces evidence of "certain indicia or badges of fraud, the burden shifts

10   to the defendant to come forward with rebuttal evidence that a transfer was not made to defraud the

11   creditor." *Pat Clark Sports, Inc. v. Champion Trailers, Inc.*, 487 F. Supp. 2d 1172, 1177–78 (D.

12   Nev. 2007); *see also Sportsco*, 917 P.2d at 938 (same). As the Seventh Circuit has observed:

13

14

15

Where all circumstantial evidence points to fraudulent intent, at least some of it has to be explained away. Neither summary judgment nor directed verdict can be avoided by simply saying, "nevertheless, it is not so." . . . Because the [defendants] "fail[] to indicate any motive or intent to support [their] position" of innocent conveyance, the judgment [against defendants] is affirmed.

16   *U.S. v. Denlinger*, 982 F.2d 233, 237 (7th Cir. 1992) (citations omitted); *see also In re Prosser*, No.

17   08-03002, 2009 WL 3270765 at *13 (Bankr. D.V.I. Oct. 9, 2009) ("Where the defendants have not

18   established sufficient facts to rebut the presumption of a fraudulent transfer, summary judgment is

19   appropriate.").

20               **a.     Realty Transferred the Property to an Insider**

21          Here, the transfer was made to an insider. The transfer was from one Ferrous Miner-

22   controlled (and thus Frank Gangi-controlled) company to another, and relationships of this sort are

23   deemed insider relationships for purposes of the Uniform Act.

24          The Uniform Act expressly defines "insider" to include "an affiliate." Nev. Rev. Stat.

25   § 112.150(7)(d). "Affiliate," in turn, is defined as a:

Page 7 of 20

corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote, by the debtor or a person who directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor.

§ 112.150(1)(b). Under this definition, Sahara is an affiliate of Realty (and all Global NAPs entities) and therefore an insider. Both Realty and Sahara are wholly owned by Ferrous Miner, which is wholly owned by Frank Gangi. Realty and Sahara share the same president: Gangi. They share the same director and officer; Gangi is the sole officer and director of Sahara and one of two of Realty, along with Gangi's brother-in-law. They share the same decision-maker: Gangi. In short, because both defendants share the identical ownership structure (and near-identical management structure), Sahara is an insider. *See In re Nat'l Audit Def.*, 367 B.R. at 221 (finding that corporations were "affiliates" and thus "insiders" of the debtor where corporations were controlled and owned by officers of the debtor); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. Ct. App. 2002) (finding that a corporation was an "insider" of another corporation based on "common ownership and management" where the two companies were wholly owned by the same individual).

The case of *South Side National Bank v. Winfield Financial Services Corp.*, 783 S.W.2d 140 (Mo. Ct. App. 1989), decided under Missouri's Uniform Act, is particularly instructive. There, the same individual, Mr. Robert Scott, was the president, sole shareholder, and lone director of both Winfield Investment Co. ("Winfield Investment") and Winfield Financial Services Corp. ("Winfield Financial"). *Id.* at 141–42. The plaintiff filed suit against Scott and Winfield Investment. On the eve of trial, Winfield Investment transferred fourteen vacant lots to Winfield Financial. The lots were allegedly transferred between the companies in partial satisfaction of a $145,650 pre-existing debt, and the transfers left both Winfield Investment and Robert Scott without any assets. *Id.* at 142. The court held that the property transfers at issue constituted actual fraud and remanded to the trial court to set aside the conveyance as void. The court observed that the buyer and seller were "controlled

1   by the same person" and that the "legal fiction of the independent existence of the corporate entity

2   will be disregarded where two corporations are being manipulated through their interrelationship to

3   cause illegality, fraud or injustice." *Id.* at 144. The transfers were "equivalent to Scott's juggling the

4   properties from himself to a corporation and from one corporation to another corporation merely to

5   avoid obligations to a third party." *Id.*   In the court's view, "Scott was the alter ego of the

6   corporations and the corporations were a subterfuge." Because Scott was the "alter ego of the two

7   corporations, he was effectively transferring the properties in question to himself." *Id.*

8         That is exactly what happened here. Frank Gangi essentially has transferred the property in

9   question to himself. Indeed, at his deposition, Gangi himself relied upon the close relationship

10  between Realty and Sahara to explain why Sahara did not feel it necessary to conduct its own

11  independent review of the value of the property it was acquiring:

12            [T]hese are related parties that know one another. They trust one another.
              Am I going to steal from myself? I'm the ultimate owner of Realty. I'm the ultimate
13            owner of Sahara. So am I going to steal out of one pocket and put it in the other?
              I mean, it's a nonsensical question if you understand the structure of the company, the
14            ownership.

15  (#46, Ex. B, at 184:12–18). By the end of the passage, Gangi does not even bother to refer to Realty

16  and Sahara in the plural number, referring rather to both entities collectively as "the company." Just

17  when the reader thinks a clearer admission that Sahara was an insider with respect to Realty could

18  not be imagined, Gangi justifies the lack of any documentation regarding the purported consideration

19  for the transfer by stating:

20            I'm not sure there is a document . . . . I just know that there is[, b]ecause I'm
              the sole shareholder ultimately of Sahara and Arden. I'm the sole officer and director,
21            and I know what we did. . . . I'm in a unique position to know exactly what my
              understanding is of the agreement I made with myself.
22
    (*Id.*, Ex. B, at 191:1–192:16). Furthermore, in connection with the conveyance, Defendant sought
23
    an exemption from the State of Nevada from the real property transfer tax that otherwise would have
24
    been due on the basis that the "Property [is] being transferred between companies with identical
25

Page 9 of 20

1   ownership." (*Id.*, Ex. I).  This badge of fraud is established.

2           **b.      The Transferor, Realty,  Retained Possession and Control of the Property After the Transfer**

3

4           The documents establish that the purported transfer had no effect whatsoever on the identity

of the property's owner.  Put differently, the "only differences in the properties which existed after
5
the transfers were the names in which the parcels were titled." *S. Side*, 783 S.W.2d at 144; *see also*
6
*Gabaig v. Gabaig*, 717 P.2d 835, 839 (Alaska 1986) (finding
7
that a transferor retained premises and "acted as if he were the true owner" where he continued to
8
pay taxes on property).
9
            **c.      Before the Transfer Was Made, Realty Had Been Sued or Threatened with Suit**
10

11          Another badge of fraud exists when, before transfer of the property, the debtor has been sued

12  or threatened with suit.  The lawsuits do not need to be brought by the same creditor seeking to set

13  aside the fraudulent conveyance; any lawsuit will do, because it serves to put the debtor on notice that

14  it may be called upon to satisfy a judgment. *Sportsco*, 917 P.2d at 938 (noting that the debtor was

15  "a defendant or potential defendant in a number of pending or threatened lawsuits regarding his

16  debts").  Similarly, a lawsuit "counts" for purposes of the Uniform Act regardless of whether it is

17  brought against the debtor or a company closely connected with the debtor. *E.g.*, *In re Prosser*, 2009

18  WL 3270765 at *10–11 (finding fraud where litigation was pending against debtor's predecessor

19  corporation as well as its parent, although the debtor itself was not a defendant to those suits at the

20  time of the challenged transfer).

21          At the time of the November 2005 transfer of the Property, both Realty specifically and

22  the Global NAPs family generally, of which Realty is an alter ego, had been sued several times.

23  Realty itself was a defendant in at least one case as of November 15, 2005.  In addition, one or more

24  of the related "Global NAPs" entities had been named in at least six cases or administrative

25  proceedings as of November 15, 2005 (and Realty was later added as a defendant or counter-

1    defendant in four of them). (*See id.*, Ex. S). Most importantly, Global NAPs, an alter ego of Realty,

2    had been sued in 2004 by Plaintiff itself in the Connecticut litigation. This badge of fraud is satisfied.

3                    **d.      Defendant Did Not Conceal the Transfer**

4            Quitclaim deeds are notorious indicators of fraudulent conveyances. *See, e.g., United States*

5    *v. Fincher*, 593 F.3d 702, 705 (8th Cir. 2010). The Bankruptcy Reports are filled with cases avoiding

6    such transfers. Recently, this Court has seen this maneuver even in garden-variety foreclosure cases

7    where a person attempts to quitclaim a property to his or her spouse to avoid creditors where the

8    mortgage is only in the transferor's name. The quitclaim deed conveying the Property in this case is

9    attached and was recorded. (*See* #46, Ex. G).

10           Courts have deemed a transfer to be concealed for purposes of a fraudulent transfer analysis

11   where the formal documentation did not reflect the actual circumstances surrounding the transfer.

12   For example, in *In re Prosser*, 2009 WL 3270765, the defendant had duly recorded the

13   deed evidencing the conveyance of the property. *Id.* at *9. However, the court determined that

14   the transfer nevertheless was concealed, because the defendant had not revealed "sufficient

15   information that would put creditors on notice of the fraudulent nature of the transaction." *Id.* at

16   *8–9 (noting, among other deceptive practices, that the debtor's board was not apprised of the

17   transfer; the defendants' audited financial statements were "misleading," delayed, and

18   "inaccurately described the transfer"; and the promissory note signed by the insider transferee

19   was not available to the public).

20           Plaintiff argues the true circumstances of the transfer are not revealed by the publicly filed

21   quitclaim deed and declaration of value because the documents contain no mention of a loan that is

22   being transferred from one insider to another. But this is not the case. The Declaration of Value

23   makes it clear that the buyer and seller are the same person (Frank Gangi), with the same business

24   address. (*See* #46, Ex. G, at 4). This is enough to put the public on notice of an inside transaction.

25   The transfer was not concealed.

1          e.      **There Was No Consideration**

2          There was no consideration for the transfer of the property to Sahara.  As Plaintiff notes,

3    Defendants cannot point to a single document that establishes that the transaction was anything other

4    than one Frank Gangi-controlled company moving a property to another Frank Gangi-controlled

5    company in order to insulate that property from creditors.

6          Under Nevada law, satisfaction of an antecedent debt can constitute fair consideration,

7    but only if the antecedent debt is valid and existing. *Pat Clark Sports*, 487 F. Supp. 2d at 1179;

8    Nev. Rev. Stat. § 112.170.  Proper documentation of the debt is necessary. *See In re Nat'l Audit*

9    *Def.*, 367 B.R. at 225–26 (rejecting debtors' arguments that transfer was made in payment of a

10   pre-existing loan by noting that debtors could not "connect[] these notes to any particular transfer"

11   and that "[t]his failure to link specific transfers with alleged loan repayments is fatal"); *Swinford v.*

12   *Teegarden*, 60 S.W. 1089, 1091 (Mo. 1901) (holding that there was inadequate consideration based

13   on the partial satisfaction of an antecedent debt because a "careful examination of the testimony fails

14   to show sufficient data to state an indebtedness . . . and the testimony offered by the defendants on

15   this subject *is so vague, general and wanting in details that it is impossible to state any account*

16   *between them or to afford a reasonable basis of calculation*") (emphasis added).  Moreover, when

17   parties are alter egos of each other, courts have found no valid consideration for the satisfaction of

18   antecedent debts. *S. Side*, 783 S.W.2d at 144 (finding actual fraud where a debtor conveyed

19   properties from one corporation to another; he was the "alter ego of both corporations and his

20   conveying the properties to repay an indebtedness was tantamount to satisfying a debt to himself").

21          Again, this is exactly what happened here.  Realty purportedly transferred the Property to

22   Sahara in exchange for Sahara agreeing to assume a debt that Realty owed to Frank Gangi. (#46, Ex.

23   B, at 189:9–12 ("Realty's debt to me was extinguished and then a new debt was created with Sahara

24   and -- Sahara and Arden from them to me. So Realty no longer had that debt, you know, and that

25   was the consideration.")).  As a matter of law this is not valid consideration because the debt to Gangi

1   was simply passed from one of his alter-ego companies to another.

2          Furthermore, there are no loan agreements evidencing the transaction; nor has Sahara

3   recorded an interest expense in connection with the conveyance. (*Id.*, Ex. B, at 189–91). No

4   promissory notes exist. (*Id.*, Ex. B, at 191:7–9). Indeed, Sahara admits it has no bank account,

5   income, revenues, or assets other than the property, (*id.*, Ex. D, Resps. to RFA 11, 12, 24–28), so

6   it has no plausible way to repay the "loan" from Realty. In other words, Realty gained nothing and

7   Sahara gave nothing for this transaction. Gangi simply rearranged debt owed to himself by his own

8   wholly-owned and -controlled companies. Neither Sahara nor Realty performed an appraisal of the

9   property in connection with the transfer. (*Id.*, Ex. D, Resp. to RFA 40; *id.*, Ex. C, Resp. to RFA 1).

10  Sahara did not conduct a title search prior to the conveyance. (*Id.*, Ex. D, Resp. to RFA 39). Instead,

11  brothers Richard and Frank Gangi unilaterally determined to transfer the property and at what value,

12  without conducting any independent review. (*See id.*, Ex. B, at 181 ("[M]y brother was the seller and

13  I was the buyer and that's the number we came up and agreed upon . . . ."); *see also id.* at 184:12–13

14  ("[T]hese are related parties that know one another [and] trust one another.")). That is not enough.

15  *See Textron Fin. Corp. v. Kruger*, 545 N.W.2d 880, 884 (Iowa Ct. App. 1996) (holding that a

16  transfer was fraudulent where, inter alia, the transferor did not take "any steps to independently

17  determine" the land's value, and the transferee relied only upon the opinion of his attorney, "who was

18  unable to explain or justify his opinion"). There was no consideration here.

19              f.   **Realty Was Insolvent or Became Insolvent Shortly After the Transfer
                     Was Made**

20

21          Under Nevada law, a party is deemed insolvent if, *inter alia*, "the sum of the debtor's debts

22  is greater than all of the debtor's assets at a fair valuation." Nev. Rev. Stat. § 112.160. At his

23  deposition, Gangi testified that Realty was profitable at the time of the conveyance, based on his

24  "knowledge running around the building." (*Id.*, Ex. B, at 77:17). This testimony is at odds with the

25  documentation establishing that Realty was operating at a loss in 2005. Realty's failure to keep

1   separate records in 2005 raises an inference of insolvency, one made even stronger by Realty's and

2   Global NAPs' subsequent destruction of financial datadocuments. However, the few documents that

3   do exist—produced by Realty's accountants—confirm that Realty was insolvent in 2005.

4           In a July 2006 email, the CFO of the Global NAPs entities admitted that "[Global] Inc. and

5   Realty are the smaller companies and currently show losses." (*Id.*, Ex. V (7/7/06 email from Ann

6   Hartman)). And shortly after the Connecticut court granted SNET the $5.25 million prejudgment

7   remedy in April 2006, Frank Gangi sent an email to Global NAPs' CFO, stating that "GNAPs inc.

8   [sic] does not have 5.2 [million] worth of assets anywhere." (*Id.*, Ex. S (5/27/06 email from Frank

9   Gangi)). This factor is satisfied.

10              **g.    The Transfer Was of Substantially All of Realty's Assets**

11          At the time of the transfer, Realty had few assets. When asked at his deposition to identify

12  the assets that Realty had as of the date of the conveyance in November 2005, Frank Gangi's

13  response was that "I can't tell you with specificity." (*Id.*, Ex. B, at 80:14). When asked to identify

14  the documents that would reflect Realty's assets, Frank referenced "invoices or cancelled checks" in

15  relation to Realty's personal property—none of which were produced and, according to defense

16  counsel, no longer exist—and "deeds" in relation to Realty's real property—none of which were

17  produced. (*Id.*, Ex. B, at 81:3–5).[4]

18          The evidence shows that Realty only owned three pieces of property at the end of 2004.

19  However, in December 2004, Realty quitclaimed a building in Massachusetts to a "corporate shell"

20  entity named after the property, 1120 Hancock, in exchange for the entity assuming a debt owed to

21  Gangi by Realty—the same pattern as in the present case. (*Id.*, Ex. T; *id.*, Ex. B, at 84; *id.*, Ex. E, at

22  1-75:14–16)). In April 2005, Realty transferred a building in Atlanta to another Ferrous

23  Miner-owned shell entity named after the property, 1003 Donnelly Avenue, Inc., again in exchange

24  _____

25  [4]The supposed real property assets might not be assets at all. As Gangi testified, the real
estate "came with a liability. I don't think Realty had any equity in them." (*Id.*, Ex. B, at 80:7–9).

for a reduction of debt owed by Realty to Gangi. (*Id.*, Ex. U; *id.*, Ex. B, at 89:2–19). Thus, in

November 2005, when Realty conveyed the Property to Sahara, it was transferring its last piece of

real property. (*Id.*, Ex. B, at 84, 89); *see S. Side*, 783 S.W.2d at 144 (finding that debtors did not

have property of any "monetary value" after transfer of all real estate). Gangi further speculated that

Realty had anywhere between 0-100 "customers" in 2005, but, again, could not say for certain and

did not produce any written records verifying the number of, or proceeds from, these customers.

(#46, Ex. B, at 84, 89). Realty was made insolvent by the transfer of the Property.

### h. The Transfer Occurred Shortly Before or After Realty Incurred a Substantial Debt

The transfer occurred in November 2005. In April 2006, SNET obtained a prejudgment

remedy of $5.25 million against Global NAPs, Inc. in the Connecticut case. Several other lawsuits

were pending.

In summary, there are easily sufficient badges of fraud for the Court to find the transfer of the

Property to have been actually fraudulent. Coupled with the fact that the Connecticut district court

found that Realty and the other Global NAPs entities withheld and destroyed documents that

undoubtedly would be relevant, SNET has carried its initial burden under Rule 56.

### 2. Defendant Fails to Meet its Shifted Burden

As noted, *supra*, when the presumption of fraud arises, as it has here, the burden shifts to the

defendant to "explain[] away" the badges of fraud. *Denlinger*, 982 F.2d at 237. Defendants have not

produced a single document that reflects consideration being paid for the Property. They have not

explained away the facts that the transfer was from one Gangi-owned company to another, and that

two brothers, one purportedly representing each party, agreed on the value of the property being

transferred without having an appraisal conducted. They have not explained away the fact that

several lawsuits were pending against Realty and the larger Global NAPs family at the time of the

transfer of the Property, or that Realty and the Global entitles had incurred liabilities around the time

1    of the transfer. They have not explained away the fact that Realty had little, if any, assets at the time

2    of the transfer, or that Realty had transferred away its three pieces of real property over eleven

3    months. They have not established that Realty was solvent in November 2005. Indeed, defendants'

4    30(b)(6) representative and owner of the entire Global NAPs empire repeatedly refused to provide

5    virtually any information, testifying, for example, that he did not know Realty's revenues for 2005.

6    (*Id.*, Ex. B, at 81:20–21). He did not know whether and when Realty had a bank account. He did

7    not know how many customers Realty had in 2005 or today. However, he did testify that the

8    property was transferred for "liability" purposes—"Realty decided it no longer wanted to be an owner

9    of the property, and I didn't want to have my property owned by Realty. I wanted them to be

10   separate entities. I didn't want all my eggs in one basket." (*Id.*, Ex. B, at 175:20–23; *see also id.*, Ex.

11   B, at 176 ("[Y]ou know, if somebody trips and falls in one facility, they can't sue them over another

12   facility.")).

13          Defendants argue that Plaintiff's evidence is not authenticated. But there is no reason to

14   doubt the authenticity of the transcripts of Gangi's deposition. Even if considered as hearsay, it falls

15   within the residual exception. *See* Fed. R. Evid. 807. Moreover, Gangi's entire deposition, as a party

16   admission, is non-hearsay. *See* Fed. R. Evid. 801(d)(2). And Defendants have authenticated a copy

17   of the deposition, in any case. (*See* #51-1 at 214). Defendants make several arguments against a

18   finding of fraud.

19          First, in support of their contention that adequate consideration was given for the Property,

20   Defendants adduce a "Buyer Estimated Closing Statement" from Fidelity National Title Agency of

21   Nevada, Inc. representing a balance of charges and fees relating to an escrow account for "Vacant

22   Land, NV." (#51, Ex. 2, at 3). This document does nothing to show consideration from Sahara to

23   Realty. Sahara is not even mentioned on the document, which is merely an informational document

24   between Realty and a title agency. In fact, the document seems to relate to a transfer of land from

25   The 1980 Jarrett Family Trust to Realty. (*See id.*). The only evidence of sale from Realty to Sahara

1   produced are excerpts from Gangi's deposition, which have already been addressed.  Defendants

2   claim that Sahara is wholly owned by Ferrous Miner but fail to note that it is res judicata that Ferrous

3   Miner and Realty are owned by Gangi and alter egos of one another.  Sahara is clearly an insider with

4   respect to Realty.  Gangi admitted in his deposition that when he transferred the property from Realty

5   to Sahara, it constituted an "agreement I made with myself." (*Id.*, Ex. B, at 192:16).

6        Second, Defendants argue there is no evidence that Realty retained possession of the

7   Property, a vacant lot.  But in this case, it is equally difficult to say that Sahara took possession of

8   it.  Perhaps this factor is unimportant here, because physically speaking, neither party ever really

9   occupied the lot, so it perhaps makes no sense in such a situation to ask whether a party has

10  transferred physical possession.

11       Third, Defendants correctly note that the recording of the deed shows that the conveyance

12  was not concealed.

13       Fourth, Defendants argue there is no competent evidence of pending or threatened litigation

14  at the time of the transfer, because Plaintiff did not amend its complaint in the Connecticut litigation

15  until 2006.  But this does not mean that Realty was not under the threat of litigation.  Plaintiff

16  amended its complaint in the Connecticut litigation only after Gangi admitted the various defendant

17  entities existed for a common purpose.  Realty had already perceived the threat of litigation against

18  it upon the filing of the case, however.  Indeed, it was the failure of Realty and other alter egos of

19  Global NAPs, Inc. to provide financial documents that would likely reveal the alter ego relationship

20  that led the Connecticut district court to make the alter ego ruling as a contempt sanction.  Realty was

21  not joined earlier simply because Plaintiff did not yet know of its potential alter ego liability.

22       Fifth, Defendants argue that the transfer was not a transfer of substantially all of Realty's

23  assets.  Realty "did not own the Property outright but instead was indebted by an amount of at least

24  $215,000." (#51 at 13:13–14).  Nevada is a lien-theory state.  That means that a debtor/mortgagor

25  holds legal title to a property, subject to the creditor/mortgagee's right to foreclose upon default of

1    an obligation secured by the property.  Owing an obligation secured by real property does not affect

2    the debtor's title before default.  And Defendants provide no evidence of a deed of trust from Sahara

3    to Realty, anyway.  Defendants also argue that there was little equity in the Property because the

4    amount of the lien against it approximated the value of the Property.  But Defendants ultimately do

5    not identify any of Realty's other assets at the time of sale.

6        Sixth, Defendants argue that Realty did not "abscond" with any assets.  It is not clear which

7    factor Defendants attempt to argue under here.

8        Seventh, Defendants argue again that Realty did not conceal assets, which is already

9    discussed, *supra*.

10        Eighth, Defendants argue that Sahara gave Realty adequate consideration via its assumption

11   of Realty's debt to Gangi.  Defendants admit there is no writing evidencing such an arrangement.  As

12   already discussed, this was not consideration because Gangi simply transformed, on paper—no, not

13   even on paper, but apparently only in his mind—a debt owed to him by one of his wholly-owned

14   companies into a debt owed to him by another of his wholly-owned companies.  This is not

15   consideration.  Defendants also argue that Realty never owned the Property because there is no

16   evidence Realty paid for it.  But Gangi admitted Realty owned the Property in his deposition when

17   he discussed its transfer to Sahara.

18        Ninth, Defendants argue there is no competent evidence that Realty was insolvent when it

19   made the transfer.  The best piece of evidence against this denial is the over $5 million lawsuit that

20   Realty was facing at the time of transfer, and that just a few months after the transfer, the district

21   court entered a prejudgment remedy against Realty and other defendants in that amount.  Even

22   disregarding the emails provided as evidence, as Defendants argue the Court should do, Defendants

23   have failed to produce relevant financial documents and were sanctioned for this failure by the district

24   court.  The Court may infer insolvency from these circumstances.

25   ///

1    Tenth, Defendants argue that there is no evidence that Realty incurred a substantial debt

2    before or after the transfer, because the 2006 prejudgment remedy was directed at Global NAPs, not

3    Realty. Again, the district court has adjudicated that these entities are alter egos of one another.

4    Defendants fail to carry their shifted burden of proof. Defendants' failure to provide evidence,

5    coupled with the fact that the underlying judgment out of which this case arises was entered against

6    Realty and the other Global NAPs defendants for the very reason that they destroyed documents and

7    refused to provide the court with the requested information, makes summary judgment appropriate.

8    As the Seventh Circuit has observed, "[n]either summary judgment nor directed verdict can be

9    avoided by simply saying, 'nevertheless, it is not so.'" *Denlinger*, 982 F.2d at 237.

10   **B.    Constructive Fraud**

11   Although the Court need not find the transfer to be constructively fraudulent in addition to

12   being actually fraudulent, Realty's conveyance of the property to Sahara was also constructively

13   fraudulent. Under Nevada law, even if there is no proof of actual intent to defraud—which there is

14   here—a conveyance nonetheless can be set aside as fraudulent as a matter of law.

15   A transfer will be set aside if the debtor did not receive "reasonably equivalent value in

16   exchange for the transfer" and the debtor (1) "was engaged or was about to engage in a business or

17   transaction for which the remaining assets of the debtor were unreasonably small in relation to the

18   business or transaction; or (2) intended to incur, or believed or reasonably should have believed that

19   he would incur, debts beyond his ability to pay as they become due." Nev. Rev. Stat. § 112.180(1)(b).

20   Here, SNET has established each of the required elements. First, Realty did not receive

21   reasonably equivalent value in exchange for the transfer of the Property. Rather, Realty transferred

22   the property to an insider in exchange not for money but for the assumption of a debt previously held

23   by Realty, even though the insider had no income and no revenue and no way ever to repay the debt

24   that it assumed, and notwithstanding the fact that there are no written documents concerning this

25   purported arrangement. Moreover, Realty did not conduct an appraisal or otherwise satisfy itself as

1  to the value of the property it was transferring; instead, Richard and Frank Gangi unilaterally

2  determined to transfer the property and at what value. (#46, Ex. B, at 181:11–14).

3       Second, at the time of the conveyance in November 2005, Realty was engaged in business for

4  which its remaining assets were unreasonably small in relation to the business, and/or it intended to

5  incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to

6  pay as they became due. Nev. Rev. Stat. § 112.180(1)(b). Realty had little, if any remaining assets

7  in November 2005. It had transferred all of its real estate to other Frank Gangi-owned and -

8  controlled entities. As set forth above, Realty's expenses and liabilities outweighed any purported

9  revenues or assets. It had been named as the defendant in several lawsuits, and at least one judgment

10 was soon entered against its alter ego. For these reasons, the transfer was constructively fraudulent

11 as a matter of law. Summary judgment is proper on this basis, as well.

12                     **CONCLUSION**

13      IT IS HEREBY ORDERED that the Motion for Summary Judgment (#46, #47) is

14 GRANTED.

15      IT IS FURTHER ORDERED that the transfer of the property located at the intersection of

16 Sahara Ave. and Arden St. in Las Vegas, Nevada, APNs 161-05-810-229, 161-05-810-230, 161-05-

17 810-231, 161-05-810-232, and 161-05-810-233 from Global NAPs Realty, Inc. to Sahara & Arden,

18 Inc. via quitclaim deed is set aside as a fraudulent conveyance.

19      IT IS FURTHER ORDERED that this order shall serve as a writ of execution against the

20 above-named parcels in favor of Plaintiff The Southern New England Telephone Co.

21      Dated: This 18th day of May, 2010.

22

23

24

25                               United States District Judge